**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ERIC KATZ, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE | ) |
| (Drug Enforcement Administration | )    Civil Action No.: |
| As to specific claims) | ) |
| | ) |
| WILLIAM BARR, Attorney General | ) |
| U. S. Department of Justice | ) |
| 950 Pennsylvania Avenue | ) |
| Washington D.C. 20530 | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Eric Katz ("Agent Katz" or "Plaintiff") by and through his undersigned counsel, according to his knowledge as to his actions and upon information and belief as to the actions of others, hereby files this Complaint and alleges as follows:

### Summary of the Action

1.     This action arises out of a series of violations of the Rehabilitation Act of 1973 (which incorporates the standards of the Americans with Disabilities Act) by the Drug Enforcement Administration ("DEA" or "Agency") against the Plaintiff, Eric Katz. The facts below detail an intentional manipulation of the Equal Employment Opportunity process, as it relates identification of and an accommodation of Mr. Katz's disabilities, to maneuver Mr. Katz out of his position as lead on the Cellular Abductor Tracking System (CATS) and to force his retirement from the Agency. While this case involves discrimination based on physical disability and misuse of medical information, the Agency has also sought to punish Mr. Katz for protesting

1

the unlawful award of DEA contracts to former senior DEA officials, masquerading as Native American 8(a) contractors and reporting his concerns to the Federal Bureau of Investigation ("FBI") and the Department of Justice Office of Inspector General ("DOJ IG" or "IG").[1]

2.     As the Complaint details, the DEA ignored the protections that apply to the collection, use and dissemination of protected medical and health information, engaged in discrimination based on actual and perceived disability, improperly denied and removed previously granted reasonable accommodations, failed to engage in the interactive process, and instead tried to manipulate it to force Plaintiff to seek to withdraw and renew his requests for previously granted accommodations, imposed an improper Fitness for Duty Examination, violated the Rehabilitation's Act requirement that medical information be reviewed by qualified, properly licensed medical professionals, and engaged in blatant reprisal for protected activity.

3.     The culmination of these actions led the Agency to transfer Mr. Katz, away from his required, highly specialized medical care, placing him at risk for serious injury or death.  In addition, this transfer was to strip Katz of telecommuting privileges and require him to report, on

---

[1] This case actually involves two interrelated sets of facts, one involving whistleblower reprisal and the second involving EEO based claims. This case could be, under certain circumstances, considered a mixed case appeal since it involves claims of whistleblower reprisal, EEO violations and a constructive termination. A mixed case appeal is an appeal filed with the MSPB that alleges an appealable agency action was effected, in whole or in part, because of discrimination." ). "Normally, an employee alleging unlawful employment actions by an agency must split his claims into separate actions before different administrative entities depending on the allegations." Id. "A mixed case appeal is, in essence, a hybrid action allowing an employee to streamline his case by bundling his claims into one proceeding before the MSPB." *Zachariasiewicz v. U.S. Dep't of Justice*, 395 F. Supp. 3d 734, 738 (E.D. Va. 2019).   In *Zachariasiewicz* , Judge Alston held that a mixed case appeal could not reach a claim where the whistleblower reprisal portion of the claim did not involve one of the five enumerated adverse actions set forth at 5 U.S.C. 7512, (removal, suspension of more than 14 days, a reduction in grade, a reduction in pay, or a furlough of 30 days or less. Judge Alston also determined that since the matter was asserted as a mixed case, dismissal of the mixed cased deprived the Court of further jurisdiction. That matter is on appeal to the Fourth Circuit, on the basis of *Perry v. Merit Systems Protection Bd.*, —— U.S. ——, 137 S. Ct. 1975 (2017), allowed a party to bring a combined case into federal court so long as the case had been dismissed by the Board and one of the allegations involved discrimination, since discrimination claims grated the District Court jurisdiction over at least that portion of the case.

Rather than risk dismissal of the entire claim, Mr. Katz files this action, while pursuing his whistleblower claim before the Merit Systems Protection Board.

site, in Arlington, Virginia during a pandemic. The DEA, despite numerous written objections, the filing of an administrative complaint alleging discrimination and the objection of their own EEO Office, brushed aside reality and federal law to declare Mr. Katz no longer entitled to accommodations. Katz the faced a Hobson's choice: he could put his health and safety at risk and accept the transfer or retire. Under protest he retired, prematurely ending an otherwise unblemished career.

4.     As noted below Katz was subject to a severe, pervasive and continuous hostile work environment, that culminated in his retirement, rather than in risking his health and safety.

5.     After having exhausted his Equal Employment Opportunity Claims through the Federal Sector Processing regulations set forth at 29 C.F.R. §1614. 101, *et. seq*.,[2] Plaintiff now brings this  suit (the "Action") against the United States Department of Justice (the "Agency" or "Defendant"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*., the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §633a, *et seq*., and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791, *et seq*.

## Jurisdiction and Venue

6.     Defendant is an "employer" within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(b), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §633a, and the Rehabilitation Act of 1973, 29 U.S.C. §791, and is subject to the protections of those acts.

---

[2] The Constructive Termination claim filed in this complaint were done in retaliation and reprisal for the filing of Katz's EEO complaint. These claims may be brought in this action and do not need to be administratively exhausted, as they arise out of and are logically connected to the original claims. See, *Chang Lim v. Azar,* 310 F. Supp. 3d 588 (D. Md. 2018).  As courts have repeatedly held "retaliatory acts that follow the filing of a formal EEOC complaint are reasonably related to the complaint and thus may be raised for the first time in district court,"  *Hunter v. Vilsack,* No. DKC-07-2655, 2010 WL 1257997, at *9 (D. Md. Mar. 26, 2010). This is proper here, because the constructive discharge claim arose after the EEOC charge was filed and investigated by the Agency.

7.      Plaintiff is an "employee" within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(f); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §633a, *et seq*.; and the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*., and is covered by the protections of those acts.  Plaintiff resides in North Carolina.

8.      **Jurisdiction:** This court has jurisdiction arising under 28 U.S.C. §1331. Federal question jurisdiction gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States.  Jurisdiction is also appropriate because the defendant is a federal agency.  Jurisdiction is appropriate against the Department of Justice and its component agency the Drug Enforcement Administrations, pursuant Title VII of the Civil Rights Act of 1964, 42 U.S. Code §2000c.

9.      **Venue**: Venue is appropriate in the Eastern District of Virginia under 28 U.S.C. §1391, as the federal defendant is headquartered there, and the majority of acts complained of under the various statutes occurred in Arlington, Virginia, where the DEA is headquartered. The Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967 also posits venue in the place where the conduct complained of arose.

**Parties**

10.     **Plaintiff, Eric Katz**:  At times relevant to the Complaint, Plaintiff Eric Katz was an "employee" of the Agency, within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(f); and the Rehabilitation Act of 1973, 29 U.S.C. §791 *et seq*., and is covered by the protections of those acts.  Katz is a resident of the State of North Carolina.

11.     **Defendant William Barr**: William Barr is the Attorney General of the U.S. Department of Justice of which the Drug Enforcement Administration is a component Agency. Pursuant to Title VII, Barr is required to be a named party defendant.  It is not believed at this time that Barr has any personal knowledge of, or engaged in, any discriminatory conduct toward the

Plaintiff.  The true discriminatory actors, as currently known to the Plaintiff, are employees of the DEA, who supervised Plaintiff.

### Administrative Exhaustion

12.     Plaintiff made initial contact with the DEA EEO office on March 8, 2019 and filed an amendment on March 18, 2019 to include retaliation and reprisal.  After informal attempts to settle the compliant failed, Plaintiff filed a formal complaint on April 17, 2019. The 180th day from the filing of the initial complaint occurred on October 14, 2019. The Agency has yet to issue a Final Agency Decision on the Complaint and no hearing has occurred before an Administrative Judge of the EEOC.

13.     In the administrative EEO Complaint, the Plaintiff raised claims of hostile work environment, unauthorized sharing of medical information, disability discrimination (failure to accommodate), age discrimination, and retaliation.  The EEO Complaint was amended April 25, 2019, May 6, 2019, May 13, 2019, May 14, 2019, May 31, 2019, June 7, 2019, June 13, 2019, and August 27, 2019, to include the claims of enumerated below:

    a.   Initial EEO Complaint:

I.   Discrimination based on actual disability, a brain tumor, which is permanent in nature and effect and requires reasonable accommodations  to allow Mr. Katz to perform the essential functions of his position as a Special Agent, working with the CATS program, that addresses the deployment of technology to address and limit abduction of DEA and other law enforcement, military and governmental personnel by, terrorist organizations, narco-terrorists and other criminal or foreign political or military entities.

II.   Discrimination based on the denial and or rescission of reasonable accommodations including geographical placement of Mr. Katz near medical facilities that address, treat and remediate his physical impairment and its attendant limitations.

III.    Discrimination based on the denial and or rescission of reasonable accommodations to wit: discretionary telecommuting privileges, previously granted to Mr. Katz to accommodate his medical conditions.

IV.    Discrimination based on perceived disability, which has included improper comments to Mr. Katz, reduction, transfer of, or excessive scrutinization of duties; unannounced spot visits designed to embarrass or harass Mr. Katz or used as a pretext to deny reasonable accommodation and other acts including accessing and disclosing confidential, privileged medical information.

V.    Discrimination based on wrongfully obtained and/or wrongfully disclosed confidential medical information that was released to third parties, without Mr. Katz's knowledge and without his consent.

VI.    Discrimination based on misuse of or improper access to confidential, protected medical information by supervisory staff, who are unqualified to access or review the medical information in question.

VII.    Discrimination based on Requests for medical information that exceeds that properly subject to production under the Rehabilitation Act of 1973

VIII.    Discrimination based on misuse of or improper access to confidential, protected medical information by supervisory staff, who are unqualified to access or review the medical information in question, for the purpose of limiting or denying previously granted reasonable accommodations.

IX.    The creation of a hostile, retaliatory work environment through the acts described above and which is for the purpose of forcing Mr. Katz to retire from the Agency and which includes transferring his functions to a distant geographical area to constructively demote Katz and to lead to his enforced retirement from the Agency.

X.    Retaliation and reprisal for protected activity, including the filing of an EEO charge based on the above allegations and the attempt to waylay that charge through improper interference with the EEO process, through delaying the filing of the complaint and through retaliation based on the complaint, that includes all the matters set forth above including denial of reasonable accommodations, misuse and wrongful disclosure of medically protected information, excessive scrutiny of workplace duties, harassment through reduction of duties, misstatement of duties and transfer of duties.

XI.    Discrimination, retaliation and reprisal for protected activity, by harassing contractors who were supportive of Mr. Katz and wrongful terminating them from their positions to threaten Mr. Katz and retaliate against Mr. Katz for pursuing his rights under the Rehabilitation Act

XII.    Inquiring into personnel information regarding the potential retirement dates of Mr. Katz, in violation of the Age Discrimination and Employment Act.

XIII.    Coordinating with a private contractor to engage in the above conduct, by disclosing confidential medical information concerning Mr. Katz, reassigning the CATS contract to a private contractor and working with that contractor to transfer functions of the CATS program away from Mr. Katz.  Retaliation and Reprisal for engaging in prior protected EEO activity, including the filing of the informal discrimination complaint that this formal complaint encompasses and creation of an ongoing Hostile Work Environment by threatening to downgrade Mr. Katz on his performance appraisal; changing the work site for his position and removing telecommuting in an effort to force Katz to either jeopardize his medical treatment or resign from his employment.

b.    Amendments to the Complaint:

XIV.    April 25, 2019 – Amended charges to include violation of the Rehabilitation Act: Removal of Reasonable Accommodation; Failure to Engage in the Interactive and Wrongful

disclosure of Medical Information related to Disability

XV. May 6, 2019 – Amended charges of retaliation and reprisal through the attached Performance Improvement Plan, which we believe to be inaccurate, pretextual and retaliation for both prior protected EEO activity and acting as a witness in an Inspector General Investigation.

XVI. May 13, 2019 – Retaliation, reprisal and an improper request for medical information.

XVII. May 14, 2019 – Hostile work environment, retaliation and reprisal for protected EEO activity, violation of Rehabilitation Act based on improper request for medical information and de factor FFDE examination in violation of 5 C.F.R. §339.101 *et seq*. and the Rehabilitation Act. Discrimination, retaliation and reprisal.

XVIII. May 21, 2019 – Hostile work environment, retaliation and reprisal for protected EEO activity, violation of Rehabilitation Act based on improper request for medical information and de factor FFDE examination in violation of 5 C.F.R. §339.101 *et seq*. and the Rehabilitation Act, continued request for confidential medical information

XIX. May 31, 2019 – Violation of the Rehabilitation Act- Denial of Reasonable Accommodation, Refusal to participate in the Interactive Process, Improper Demands for Confidential Medical Information, Improper Fitness for Duty Examination, Improper Collection, Use and Dissemination of Confidential Medical Information; Retaliation and Reprisal for Prior Protected EEO activity, Constructive Demotion, Creation of a hostile Work Environment; Age Discrimination based on actions designed to force retirement from the Agency; Interference with the EEO process, itself.

XX. May 31, 2019 – Hostile work environment, retaliation and reprisal for protected EEO activity, violation of Rehabilitation Act based on improper request for medical information and de factor FFDE examination in violation of 5 C.F.R. § 339.101 *et seq*. and the

Rehabilitation Act.

XXI.    June 7, 2019 – Improper collection and dissemination of confidential medical information. Retaliation, reprisal for prior protected EEO activity, hostile work environment, improper withdrawal of reasonable accommodation, constructive demotion.

XXII.   June 12, 2019 – Health Unit's demand for additional medical information as violation of Federal EEO rules regarding FFDE and an improper FFDE; improper collection and dissemination of confidential medical information. Retaliation, reprisal for prior protected EEO activity, hostile work environment, improper withdrawal of reasonable accommodation, constructive demotion.

XXIII.  June 26, 2019 – Violation of the Medical Records privacy prong of the Rehabilitation Act: maintenance, collection and use, wrongful medical inquiry, wrongful Fitness for Duty Examination, Retaliation and reprisal for prior protected activity, creation of a hostile work environment and Improper denial of previous reasonable accommodation.

XXIV.   July 16, 2019 – Rehabilitation Act violations, retaliation, reprisal and hostile work environment.

XXV.    August 27, 2019 – Was the acceptance of the amendments letter from DEA no additional amendments were submitted.

14.     On April 1, 2020, the Plaintiff tendered his retirement to the Agency, asserting that such action was necessary due to the discrimination, retaliation and reprisal he suffered including the involuntary transfer back to DEA Headquarters, with a reporting date of April 1, 2020. Plaintiff alleged that his retirement was a constructive termination, since he would have completed his full tenure at the DEA in 2027, had it not been for the transfer, which put his health at risk. He includes a constructive termination claim in this cause of action and notes that federal EEO law allows the inclusion of similar claims arising out of an initial complaint without the requirement of renewed

processing. The 180- day period for exhaustion arises from the date of the initial complaint and is not affected by subsequent amendments. See Fn. 1 and *Stewart v. Iancu*, 912 F.3d 693, 706 (4th Cir. 2019).

15.      Plaintiff satisfied his obligation to exhaust his administrative remedies, having filed a charge of discrimination (Complaint Number DEA-2019-00449) with the United States EEOC, in which he requested a hearing. Neither the EEOC has acted on that request and the Agency never issued a Final Agency Decision. Plaintiff's complaint in this Court is therefore timely.

## Facts

### Katz develops the Cellular Abductor Tracking System

16.      Eric Katz had a long and distinguished career in the DEA. He served an agent from May 1996 till his forced retirement in April 2020. Katz served as a Special Agent in Tulsa, Oklahoma and in La Paz, Bolivia and then obtained a supervisory position in Fresno California in 2005. Katz was sent to DEA Headquarters in June 2010. Initially assigned to Undercover Documents Section, in 2011, Katz was moved to the DEA Command Center, and served under Chief David Dongilli, then the Chief of Operations Management.  Plaintiff Katz was, at the time of his involuntary retirement, a GS-14 Supervisory Special Agent with DEA, with no history of disciplinary actions and string of Outstanding performance ratings and accolades.

17.      Katz helped create and develop the use of the Cellular Abductor Tacking System or CATS, which gleaned information from cellular and electronic devices to capture geo-positional, and other electronic data from surrounding electronic devices within a range of an agency device. This allowed the Agency to locate a kidnapped agent or resource since the abductor normally jettisoned the cellular device of the captive upon capture.

18.      CATS operated by acquiring metadata to identify handsets and electronic devices within proximity of a targeted DEA agent or their vehicle. This would allow the DEA to locate

both an abducted asset and the persons likely to be responsible for that act.  This technology drew the attention of other federal law enforcement and counterintelligence agencies, as well as the U.S. military, who faced similar threats of abduction of personnel.

19.     During an abduction or illegal act, CATS would use an installed electronic device, in a vehicle, to act as a cell tower activated. It could then obtain cellular metadata and imaging to obtain the identification of surrounding cellular devices. This allowed CATS to obtain the surrounding telephone serial number and identify the location and identity of the actual abductors, in real time. This represented a significant advance since it gave the DEA, or any agency employing the technology, the opportunity to instantaneously identify and locate where an abduction is occurring and who is doing it.

20.     Up until the events giving rise to this complaint, Katz was considered an outstanding Special Agent and received performance ratings and awards that reflected that excellence.   His development of CATS drew praise from federal agencies and the U.S. Military, and he briefed other agencies and members of Congress on the capabilities of CATS and its technology.

### Katz is Diagnosed with a Physical Impairment in the form of a Brain Tumor and Obtains Reasonable Accommodations

21.      In 2017, Mr. Katz was diagnosed with a brain tumor, which he was informed was permanent in nature and will require lifetime monitoring. Due to the size, location, and type of tumor, highly specialized care was needed. Katz first obtained treatment from Stanford University Hospital. Continuing care was then obtained in North Carolina at the internationally recognized

Duke University Medical Center's Robert Preston Tisch Brain Tumor Center.[3]

22.     Katz's condition impacted his major life activities and thus qualified as a disability under the Americans with Disabilities Act ("ADA:) and its corresponding federal equivalent, the Rehabilitation Act of 1973 ("Rehabilitation Act"), which fully incorporates the ADA and its standards.

23.     In September 2017, Katz was advised by Keely Goode, the DEA's EEO Officer that he should submit a request for reasonable accommodations to allow him to transfer to an assignment near the Duke Medical Center.

24.     Katz was then advised by Jonathan Schleffer, the Secretary of the DEA Career Board, to submit a "hardship memorandum" to the Career Board.  A hardship request is based on DEA internal policy and does not supplant the interactive process or reasonable accommodation process under the Rehabilitation Act.  To support the request, the Career Board advised Katz he needed to disclose confidential information in excess of what the Rehabilitation Act requires. the improper request was rescinded, only because the then head of the Agency's EEO Office intervened and advised a request for Reasonable Accommodation, pursuant to the Rehabilitation Act would suffice.

25.     As a reasonable accommodation Katz was transferred to a DEA sponsored position in Fort Bragg, U.S. Army Installation, in Fayetteville, North Carolina. That transfer was specifically designed to allow Katz to work on the CATS program, which he largely created, in an appropriate location, that catered both to the need for CATS to be pursued in a secure environment

---

[3] The Center has won numerous awards and its physicians are among the most competent in the world in the treatment of brain tumors.  The DEA has never identified how Katz could obtain similar care from another center nor did it identify any facility in the national capital region that specializes in the specific and unique type of treatment plaintiff is receiving. The Agency has claimed there was a "care plan" in place to address Katz's complicated medical needs which could supplant his need to be near Duke. No such plan was ever provided to Katz.

and to the necessity of him remaining in close proximity to the Duke Medical Center Facility's Brain Tumor treatment program.

26.     The transfer to Fort Bragg also carried with it a specified title and position. Katz who had been serving as the Deputy Chief of the Command Center/Crisis Preparedness Section (OMC) in the Office of Operations Management in the Headquarters of the DEA, became the Staff Coordinator of the CATS program, thus CATS was his exclusive duty and Fort Bragg was his assigned duty station.

27.     Access to Fort Bragg itself is restricted and because the base houses the Army Intelligence and Security Command (INSCOM), Fort Bragg has areas within the base itself that limit entrance to those with the requisite security clearance level. Katz had a Top Secret Sensitive Compartmented Information (TS-SCI) Clearance. When Katz entered his work area, it was segregated, and access was strictly limited to persons like himself who held the topmost clearance. To illustrate the high level of the program, CATS program was housed in the Ground Intelligence Support Activities (GISA) Central space, an appropriately designated Secure Compartmented Information Facility (SCIF).

28.     The accommodation was vetted and granted by none other than the DEA's highest official Acting Administrator Robert Patterson, who personally approved the move.

29.     This reasonable accommodation was approved n on October 3, 2017.  It was characterized as "Reassignment to another Job."

30.     A supplemental accommodation was approved by Assistant Special Agent in Charge (ASA) Ferdinand "Andy" Large, permitting Katz to "work from home" as needed.  The latter accommodation was a medical accommodation, and per Agency policy substituted itself for a formal telework arrangement.

31.     The authorization for as needed telecommuting, recognized that Katz could

perform the essential functions of his position remotely, without any negative impact to the CATS program. Katz was given equipment that would allow him to perform his remote work while complying with Security Classification protocols.

**DEA awards Million-dollar contracts to Former DEA Supervisors with close ties to Senior DEA Management.**

32.     The DEA then sought federal contract employees to assist Plaintiff in the development of the CATS program. The DEA initially awarded the contract in September 2015, to Cherokee Nation Technology Solutions (CNTS). CTNS was, an exceptionally qualified Native American owned and operated, certified Section 8(a) Small Business Administration, government contractor. CNTS has a track record of providing technical support services and project support personnel to federal agencies including those involve in law enforcement and national defense. The company also has provided medical research, information technology, engineering support services, construction support services, asset management, program management, and mission support services, for federal agencies including those in law enforcement and national defense. CNTS is headquartered in Tulsa, Oklahoma.

33.     CNTS is part of Cherokee National Businesses (CNB), the tribally owned holding company of the Cherokee Nation, the largest Indian Nation in the United States. The Cherokee Nation and its businesses employ 9,000 people. CNB owns companies in the gaming, hospitality, information technology, personnel services, distribution, manufacturing, telecommunications, environmental services and security and defense industries.

34.     Business and federal authorities have recognized CNTS as an outstanding and successful 8(a) company. Similarly, CNTS performed well on the CATS contract and provided competent and capable employee support. CNTS directly managed the contract and did not use sub-contractors.

35.     As far as is known to the plaintiff, none of CNTS's Board, leadership or contract employee who worked on CATS, had worked for the DEA, as a federal employee and none had been personally involved as a government employee in Katz's supervisory chain or had held employment related, decision making authority over the CATS program.

36.     In 2017, senior DEA management, which included Michael DellaCorte, Deputy Chief of Operations, removed Cherokee Nation from CATS and replaced it with a company that claimed to be an 8(a) contractor, but whose real asset seemed to be that had a former DEA senior management official at the helm.[4]

37.     DellaCorte selected Cloud Lake LLC. Cloud Lake employed Barry Smallwood, a former Associate Deputy Assistant Administrator in the Office of Information Systems. Smallwood had also worked directly for Preston Grubbs, the number three ranking official who serves as Principal Deputy Administrator in the Agency.

38.     When Cloud Lake supplanted Cherokee Nation, it immediately transferred duties on the contract to Compass Strategies Solutions, LLC, a small entity run by Zoran Yankovich, a former senior DEA Special Agent in Charge of its Houston Division. Yankovich had been the

---

[4]  The removal of Cherokee Nation and its replacement by Cloud Lake appeared to violate the "Grubbs Memorandum" issued by Deputy Administrator Preston Grubbs.  The Memorandum, issued in March 2018, severely limited the award of DEA contracts to former employees. The policy states: "DEA officials are prohibited from directing or otherwise intimating that contractors hire specific individual(s) to work under DEA contract." The policy further stated that, a person who is currently a DEA employee, or has been employed by DEA within the past five years and intends to work on a DEA contract or task order, must submit a DEA Contractor Ethics Questionnaire for guidance from the Office of Chief Counsel. In Katz's administrative case, he requested documents related to the approval of the Cloud Lake and Compass contracts. The DEA failed to produce any document that established the contracts, which involved former DEA officials, were reviewed or approved by the Office of Chief Counsel. It is believed that Compass and Cloud Lake employed persons who had previously worked for the DEA within five years. This failure to comply with DEA policy was compounded by the lifetime ban on federal employees working as private citizens on matters they were responsible for in their government employment under 18 U.S.C. §207. Obviously, a representative of the Chief Counsel's Office, the official who approved the contract and the contracting officer for the DEA who oversaw the contract are directly implicated in any failure to comply with the Grubbs Memorandum.

supervisor of Michael DellaCorte and had helped him obtain promotions to supervisory positions, including it is believed the one he now holds. Compass also employed David Dongilli, a former DEA Chief of Operations who DellaCorte worked directly for and who had assisted DellaCorte to senior supervisory positions at the DEA. DellaCorte is also believed to have worked with Smallwood.

39.     The immediate pass through to Compass raised federal contracting issues. An SBA 8(a) contractor is required to supervise and perform the details of the contract. The misuse of the 8(a) status, including the assignment of the contract through a "straw man" used to obtain certification is a serious issue and violates numerous federal statutes, as well as being a form of fraud.

40.     Even more telling of the specious nature of the award, Compass did not initially assign its own personnel to take over a contract that it had to at least assert it could perform. Instead all Compass did was to entice Thomas Bordonaro and Jenna Guerra, the two employees that worked with Plaintiff through Cherokee Nation on CATS, to join Compass.

41.     In other words DellaCorte claimed to have overseen the award of a contract to Cloud Lake and Compass, that was performed almost entirely by the persons who had just worked for the prior contractor Cherokee Nation, and who in fact were the total roster of government contracting personnel, who had been performing all the contract duties. [5] This meant that millions of dollars in taxpayer dollars were shifted from a proper 8(a) recipient, into the hands of former DEA supervisors, for work they did not personally perform, apparently oversee and for which they brought no independent talent or value.  It was a contract for DEA personnel, by DEA personnel

---

[5] The contract employees were designated as independent contractors and not employees by Compass, although they performed identical full-time duties by Compass.

so that the DEA personnel could inherit the earth.

42.     What was even more suspect, is that there were no documented performance or delivery issues of any kind attributable to Cherokee. Had they existed the new recipients of the award would certainly not have hired the same employees who had been working on CATS, into their new entity.

43.     After the award of the contract to Cloud Lake and Compass, DellaCorte, suggested Compass hire a third employee, Edward Wezain, a former DEA official, to supplement Compass' ranks. The hiring was in contradiction to the Grubbs Memorandum,  prohibiting DEA personnel from suggesting of the hiring of specific personnel Adding to the suspect nature, Eric Katz did not request the hire, was not informed of the hire, was not consulted on the hire and ultimately found the new addition less than capable to assist on CATS.

44.     Apparently, what the major qualification Mr. Wezain had, was a close connection to DellaCorte and others at the DEA. Unsurprisingly, the employee was also a former DEA supervisor.

45.     Katz, Bordonaro and Guerra became convinced that the CATS program had been subjected to rank conflicts of interest, that were harming the CATS program implicating 18 U.S.C. §207. [6]

**Katz reports potential violations of Federal Law and Agency Procedure to the FBI and the DOJ IG**

46.     On January 29, 2019, Katz contacted the Federal Bureau of Investigation to complain that the removal of Cherokee Nation and its replacement by Cloud Lake seemed to

---

[6] Cloud Lake is on information and belief receiving DEA contracts worth in excess of $22,000,000. Compass is receiving what is believed to be in excess of $1,500,000 for its efforts on CATS under the current contract. Both companies are expected to seek to extend these contracts and bid on new ones with the DEA.

violate federal conflict of interest concerns, encapsulated at 18 U.S.C. Code 207 and the internal policy of the DEA that outlined the prohibition against the Agency entering into personal services contracts under Section 37.104 of the Federal Acquisition Regulation, expressly set forth and amplified in the Grubbs Memorandum. Katz informed the FBI that several of the persons now working on the CATS contract, through Cloud Lake, were former DEA employees who had supervisory control over the CATS program while they were employed by the DEA. Such conduct Katz pointed out also violated limitations placed on successor private employment by Deputy Administrator Preston Grubbs.[7]

47. Further, Katz raised concerns that current DEA employees, including his supervisors, were violating their own oath of office and federal law by awarding contracts to their friends and former colleagues. Katz then complained that Compass's selection of a third "independent contractor", seemed to lack the basic skills required to work on CATS, appeared to be sheer featherbedding.

48. The FBI agent advised Katz he would refer the matter to the FBI's Public Corruption Unit. He advised Katz to have persons submit complaints to them.

49. Between January 29 and February 5, 2019, Thomas Bordonaro, one of the persons who had worked on CATS for both Cherokee Nation and Compass, contacted the FBI Public Corruption Section and relayed similar concerns to those of Katz. The matter was then directed to Department of Justice's Inspector General's Office ("IG").

50. On February 6, 2019, Thomas Bordonaro, contacted the IG with his own complaints about the award of the CATS program to Compass and Cloud Lake. These complaints were similar

---

[7] It is believed that both Smallwood and Dongilli have both close professional and personal connections of Mr. Grubbs, thus the deviation from the "Grubbs Memo" is as ironic as it is corrupt and unprincipled.

18

to those of Katz, however, Bordonaro would include an allegation that Compass had improperly designated him and Guerra as "independent contractors", rather than employees and that such a designation violated federal labor law.

**Luke McGuire retaliates against Katz and Bordonaro for Whistleblowing on DEA award of Contracts to Former Employees**

51.     Immediately after Katz' contacted investigators, Luke McGuire, Section Chief Command Center, DEA Headquarters, who was Katz's immediate supervisor, began scheming to remove plaintiff from his position and transfer control over CATS to Arlington, Virginia.

52.     Within days of Katz contacting the FBI McGuire stated that the program needed to be shifted back to Headquarters.

53.     McGuire provided no logical rationale for moving CATS.   Instead, he made vague statements about accountability, which seem ironic, given the coup that removed Cherokee Nation and replaced it with former DEA personnel.

54.     On February 12, 2019, six days after he met with investigators, Thomas Bordonaro was suddenly terminated from the CATS program and his employment with Compass.

55.      Although McGuire would contend that the decision to terminate Bordonaro was made by Compass, Compass's leadership stated that the decision to terminate Bordonaro came directly and emphatically from McGuire. Indeed, the head of Compass contended that he wanted to retain Bordonaro.

56.     McGuire became Katz's supervisor in November 2018. Until Katz and Bordonaro reported their concerns to federal investigators, McGuire had limited involvement with CATS. McGuire had only had a single telephone conversation with Katz before February 2019, he had never visited the CATS site and had often failed to respond to inquiries from Katz prior to that point.

57.     Ignoring DEA protocol, McGuire never discussed with Katz, Bordonaro's or Guerra's performance and he never even discussed with Katz, his decision to remove Bordonaro, or his decision to transfer CATS back to headquarters.

58.     After Bordonaro was terminated he asked David Dongilli, his Compass supervisor and a former senior DEA official, why he was fired, Dongilli gave a non-sequitur answer, stating that Compass did not have a conflict of interest in the way it was awarded the contract. To Bordonaro and Katz this confirmed that the DEA had been advised of their complaints to the FBI and the OIG.

59.     Additionally, in addressing Bordonaro' s termination, Katz learned that McGuire had forwarded information to Compass, that included reference to Katz's brain tumor.

60.     Katz was not consulted about this release of sensitive medical information to a third party and did not authorize its release.

61.     The unauthorized released violated, inter alia, the Rehabilitation Act of 1973, as it was an improper use and disclosure of confidential medical information.

62.     On March 5, 2019, Katz sent an email to McGuire, reporting possible contract fraud and Section 8(a) violations by Cloud Lake and Compass. Katz contended Thomas Bordonaro had been improperly terminated for complaining about the award to Cloud Lake. McGuire was then on actual notice of the nature of the complaints against Cloud Lake and Compass.

63.     Katz also complained about the wrongful release of medical information.

64.     On March 6, 2019, Katz contacted the Kelly Goode in the EEO Office and advised her that there had been an unauthorized release of confidential medical information in violation of the Rehabilitation Act of 1973.

65.     On March 8, 2019, Katz filed an informal complaint of discrimination on the wrongful disclosure.

**Separately, the DEA and McGuire Remove previously granted Reasonable Accommodations and engage in Discrimination, Retaliation and Reprisal under the Rehabilitation Act, by Oddly declaring that Katz's condition no longer requires Accommodations**

66.     With respect to McGuire's actions towards Katz, McGuire ran into a critical roadblock to his retaliatory scheme. He discovered that plaintiff's work in North Carolina was Agency sanctioned as reasonable accommodations, for Katz's physical impairment. These accommodations had been provided to him on October 3, 2017 by the then highest ranking official in the DEA, Acting Administrator, Robert Patterson.

67.     McGuire learned from Katz that he had these accommodations, but, in violation of the Rehabilitation Act of 1973, he questioned Katz whether the accommodations had been granted and why they were required. McGuire also demanded information from the Agency confirming that Katz had accommodations.  Additionally, McGuire knew of the accommodations already from Homer McBrayer when he relieved him as Section Chief and pretended like McGuire had no idea they existed.  In this way, the agency's supposed legitimate reasons for actions taken are pretextual.

68.     McGuire went so far as to question why Katz 's reasonable accommodation required him to be stationed in North Carolina

69.     In violation of the Rehabilitation Act, McGuire repeatedly demanded medical information from Katz, in an effort to challenge the basis for his accommodations. McGuire interfered with the EEO process itself. McGuire directed Derek Orr, the DEA's Reasonable Accommodations Coordinator, to try to remove the accommodations altogether, by contending that Katz had to justify the extension of the any accommodations. Orr repeatedly pressed Katz to provide continued evidence that his accommodations were still required, although there was no valid, legitimate reason for doing so, other than to harass Katz.

70.     Orr also claimed that he was trying to evaluate Katz for a new position in

Headquarters and was doing so at the direction of "management".

71.     Orr's efforts were protested at every turn, Katz repeatedly and consistently demanded to know why the Agency was seeking to remove his accommodations, which included occupying a position near Duke Medical Center and telecommuting.

72.     The Agency refused to provide an explanation and thus refused to engage in the interactive process required under the Rehabilitation Act.[8]

73.     The DEA kept insisting that Katz return to Arlington, Virginia and did not state initially whether he would remain in charge of the CATS program or not.

74.     The Agency's actions drew a written objection from its own senior EEO Officer, who echoed Katz's concerns that the decision to transfer Katz was being done without reference to the accommodations he had been granted and was entitled to maintain. The EEO officer discussed that in order to withdraw accommodations, the Agency would need to establish they were an undue burden on the DEA.

75.     DEA management knew it could not establish that Katz's accommodations constituted any undue burden, so it then shifted tack.

76.     Unable to establish any burden on the Agency, undue or otherwise, McGuire had Deborah Lary, a registered nurse, review Katz's medical information and declare that he no longer

---

[8] Notably, The DEA's own policies on the interactive process required the agency to expand its search outside DEA to include the entire Department of Justice in its search for vacancies suitable for Katz.  The DEA agency internal manual on the interactive process states in relevant part, "If there is no equivalent level position vacant (or anticipated to be vacant) within DEA that is in the same commuting area as the employee's current position, the decision maker and Accommodation Coordinator shall, with the assistance of HR, widen the search to include vacancies in the entire U.S. Department of Justice (DOJ) that are within commuting distance of the employee's office. If, after widening the search to include DOJ vacancies, there is no equivalent level position that is in the same commuting area as the employee's current position, the decision maker and Accommodation Coordinator shall consult with the employee to determine whether the employee is willing to accept a vacant position outside of the employee's current commuting area. If so, the search shall be expanded to other geographic regions where DEA and DOJ may have vacant positions. In general, as with other transfers not required by management, DEA is not required to pay relocation expenses" There is no indication that such an effort was undertaken at the agency.

needed accommodations of any kind.

77.     Lary established no basis for this finding and ignored several submissions form Katz's physicians that accommodations were warranted.

78.     Further, Lary was, and is, simply unqualified under Federal EEO law and under Virginia law, governing the Healing Arts to render a diagnosis or a prognosis, *because only a qualified, licensed, medical doctor* can make such determinations.

79.     Lary also had no specialized training in brain tumors or their treatment and appears to have made the determination simply to facilitate the transfer. Nor could she divine whether Katz needed accommodations.

80.     Nevertheless, the Agency, through McGuire, removed Katz's accommodations and transferred him from the CATS program to a position in DEA Headquarters Division.

81.     The Agency appeared to conflate its possible authority to remove Katz from leadership over the CATS program, with the transfer of Katz back to Headquarters. Had Katz simply been reassigned to a position in North Carolina, the Agency may have been able to make at least a pretextual showing that this served some need of the Agency. Instead McGuire and the Agency insisted Katz return to Headquarters, which even without the disability accommodations issue would have run contrary to the Agency Career Progression Guide, which requires only one Headquarter tour while in the GS-14 Supervisory Special Agent rank. The significance was clear, McGuire and the DEA wanted to force Katz to make a choice between his medical treatment and its life saving nature and his employment.

**The Agency Conducts a Flawed an Unjustified Fitness for Duty Examination in Violation of the Rehabilitation Act.**

82.     In making this decision, the Agency conducted an illegal and improper Fitness for Duty Examination (FFDE). The Agency repeatedly demanded and received medical information

for the purpose of determining whether Katz could perform the essential functions of his employment. While the Agency avoided classifying its persistent demands for confidential medical information as an FFDE, the claimed basis for the demands, that it needed to determine whether to grant accommodations to Katz, would fall within the parameters of an FFDE as defined under 5 C.F.R. §339.101, *et. seq.* and under the Rehabilitation Act itself.

83.     Since Katz had already been granted accommodations by the Agency and since his medical condition was continuing, the burden was on the Agency to establish why it needed to reevaluate Katz's accommodations. But since it could not legitimately do so, the DEA instead tried to claim that Katz was alternatively seeking to continue accommodations, or that the DEA was assessing whether the existing accommodations should continue given McGuire's desire to transfer Katz.

84.      This sleight of hand also involved a fictitious review of Katz's medical records and a declaration from Deborah Lary that, miraculously, Katz was fully fit for duty and required no accommodations of any kind. As such he could be transferred to Headquarters without any reference to his medical condition or his existing accommodations.

85.     These actions perverted the protections afforded persons subject to an FFDE. It is the Agency that needs to establish the basis for the examination and it must show that, in post-employment examinations, that the employee is having physical difficulties performing the essential functions of his or her position, or that with respect to conduct, the employee is exhibiting aberrant behaviors that exhibit an issue of fitness.

86.     In the latter instance, the Agency must be careful to define the nature of its inquiry. If the Agency is requesting psychiatric or psychological records, it must identify that the employee is a danger to himself or others.

87.     In this instance, the DEA did not limit its request for medical records and would

have swept into its request psychiatric or psychological records.

88.     On every score the Agency conducted an improper FFDE, when it demanded Katz's records, had a nurse review them and had her opine on his overall fitness and need for accommodations.

89.     Under the Rehabilitation Act the employer is required to either rely on the records submitted by an employee from qualified medical doctors to determine whether he requires an accommodation and the nature of that accommodation. If the employer disagrees or has independent concerns, it can require the employee, providing its concerns are legitimate and based on concerns over the ability of the employee to perform their work, to appear at an independent medical examination, at the employer's expense.

90.     Further, the employer must limit its inquiry to only that information necessary to decide that an employee is, or is not fit for duty, or needs an accommodation.

91.     The medical records must be reviewed by a competently trained medical professional, a medical professional. Under the Act and Virginia law, only a medical doctor can evaluate a diagnosis, prognosis and treatment plan for a medical condition.

92.     Where the condition is a brain tumor, being treated by Board certified specialists, the agency, if it disagrees with the evaluation and workplace accommodations, must counter the findings with the opinion of a properly qualified doctor.

93.     The DEA distorted this entire process. It used a registered nurse to contradict the evaluations and treatment of highly trained doctors, It then tried to avoid the interactive process, the reasonable accommodations process and the protections of the Rehabilitation Act by declaring Katz free of the necessity of any accommodations whatsoever, To Katz, it appeared that Lary, was cruelly declaring him cured of a condition that was serious, possibly lifelong and which had not only limited him in his life functions, but utterly changed his life permanently.

94.     Although Katz repeatedly protested the Agency's action, the Agency not only ignored the protests, it kept devising a strategy to defeat the rationale for the reasonable accommodations by *sua sponte* declaring through a nurse who was not licensed to deliver diagnosis or prognosis that Katz no longer required any accommodation whatsoever,

**Retaliation, Reprisal and Hostile Work Environment: Excessive Scrutiny and Removal of Equipment and Responsibilities: Constructive Suspension**

95.     On March 14, 2019, McGuire made an "unannounced" visit to the CATS program location on Fort Bragg.

96.     At the time, the DEA as an entity and, McGuire personally, were aware that Katz had filed complaints with both the Agency EEO office and had participated at a witness and complainant in matters pending before the IG.

97.      McGuire arrived and removed computers from the site during his "surprise" visit. This prohibited the contract employee Jenna Guerra from being able to perform any duties on CATS and led to her involuntary resignation. McGuire's "unannounced" visit caused expense to the Agency and to the American taxpayer, that could have been avoided by a simple phone call.[9]

98.     McGuire's openly criticized of Katz for not being present, although Katz had a pre-existing   reasonable accommodation that allowed him to telework.

99.     McGuire used the "unannounced "visit as a pre-text to relocate the CATS program.

100.    McGuire himself ignored security protocols. He never advised Ft. Bragg that he was going to visit a Top-Secret Secure area of the base nor did he clear Mina Hunter, a DEA employee, in advance, who apparently accompanied him for that purpose. He also clearly did not

---

[9] Had McGuire been genuinely concerned about Katz's attendance, he could have checked and seen that Katz was logged into the internal Firebird system DEA uses for remote work.  In other words, Katz was exercising his reasonable accommodation to work remotely, and McGuire penalized him as not being present anyway.

coordinate the visit with Katz, as the whole purpose was to find fault with Katz and the project as it existed in North Carolina.

101.    On March 21, 2019, McGuire stated that, "with the visit to Fort Bragg last week" that he has determined not only to move the CATS program but also "to have your position reassigned" to the local Headquarters area (Arlington, Virginia).

102.    In reality, the move to relocate CATS had one purpose and one purpose only, to force Katz from the Agency as part of a retaliatory scheme to punish Katz for complaining about the corruption inherent in the award of CATS by senior DEA employees to their former colleagues who were now in private industry.

**Discrimination, Retaliation and Reprisal Lowered Performance Rating, Threatened Performance Demonstration Plan**

103.    For nearly two decades Agent Katz was given both mid-year and overall performance ratings of "Outstanding" by his supervisors, with no performance deficiencies in any specific performance category.   In November 2019, McGuire provided a highly critical and factually inaccurate mid-year performance review rating to Katz.   He threatened to place Katz on a Performance Demonstration Plan which is a precursor to termination.   McGuire also sharply reduced Katz to a "Successful" rating in his annual evaluation and claimed that Katz showed performance deficiencies, (which are only warranted to those receiving Unsatisfactory ratings) in oversight of the CATS program, supervising employees and written communications.[10] The rating was clear retaliation and reprisal for Katz's EEO complaint.

104.    The allegations were false and pretextual. As explained below, McGuire had

---

[10] While the rating sounds positive few agents receive the rating. The vast majority of agents receive ratings of either Significantly Exceeds Expectations or Outstanding. A "Successful" rating is actually a signal that the agent is significantly underperforming. The rating is used because it is harder for an agent to grieve or bring an adverse action appeal to than if they are rated unsuccessful.

already removed Katz from his duties on CATS in February 2019 and by July 2019 had effectively removed CATS from his chain of command.

105.    Katz objected to the lowered rating, pointing out the factual inaccuracies in the review, and also informing McGuire that he believed that the lowered rating was a product on increased scrutiny placed upon Katz due to his filing of an informal EEO Complaint against Michael Delacorte, and Luke McGuire.

106.    The filing of the informal EEO complaint was protected activity, and the communication reflect Katz's opposition to retaliation for exercising his right to file an EEO complaint.

107.    Katz also filed a grievance when his final rating was changed to merely "Successful" in all rating categories.  Despite Agency requirements that such a grievance should be handled within 30 days.  On the 36th day the agency sought and was granted additional time to respond.  Katz believed a decision on his grievance would be made within an additional 30 days. However, more than 180 days later, after a "thorough investigation" the deciding official denied the grievance.  The official had spoken with Luke McGuire and apparently no one else, including Katz.  Nonetheless, the grievance was denied.  The grievance was also protected activity, in that it reflects opposition to discrimination based on EEO activity.  The determination by the grievance official, Chief of Operations Christopher Evans was determined on January 17, 2020 but not provided to Katz until February 14, 2020.  During this period the MSPB ALJ ruled lack of jurisdiction on this issue due to internal processes having not been exhausted.  They were and when Katz questioned the agency in writing why it took a month to supply the determination memorandum, the agency refused to answer.

108.    On April 11, 2019, McGuire directed Katz to provide notice of all leave "well in advance" and required daily emails of all his work activity. This was improper and a form of

disparate and retaliatory treatment, McGuire also required Katz to justify his Law Enforcement Availability Pay (LEAP) an unheard-of request for 1811 Criminal Investigators.

109.    Katz inquired in writing for clarification from McGuire citing direction from the DEA Human Resources:  "The purpose of availability pay is to ensure the availability of criminal investigators (and certain similar law enforcement employees) for unscheduled duty in excess of a 40-hour workweek based on the needs of the employing agency. Availability pay compensates an employee for all unscheduled duty hours."  Katz inquired "I am confused as to how I would justify being available and would like to know how other teleworkers and 1811s in HQ justify their LEAP pay."

110.    Additionally, Katz advised McGuire of the following direction form the DEA Telework Procedural Guide; Teleworkers should be treated no different than non-teleworkers with regards to performance management. "It appears to me that I am being singled out and asked to do things that are not required for other employees."  Katz never received an answer from McGuire on either inquiry identified in paragraphs above.

111.     McGuire required that if Katz made a phone call, Katz would report the identity of the other person Katz talked to and what they talked about.  McGuire, who at the time knew that Katz had filed a complaint and was a represented party, did not limit his request to exclude protected communications and gave no rationale for this extraordinary inquiry. McGuire also knew as of this date, that Katz and Bordonaro had met with the IG, as witnesses and thus were statutorily protected from reprisal on those grounds as well.

**Discrimination Retaliation and Reprisal: Increased Scrutiny, Demand for Daily Reporting and Leave Restrictions**

112.    Following the surprise visit to the CATS remote location at Fort Bragg, on March 14, 2019, McGuire expressed dismay that Katz was not present.  Katz advised that if he had been

informed of the visit, he could have arranged to be present at the site.

113.    Following the visit, McGuire demanded daily reports from Katz of all of his activities, in detail so granular as to require him to list all of the phone calls Katz made and who he talked to each and every day and what was discussed.  Criteria he did not place on any other employee and in direct violation of the telework procedural guide.

**Discrimination Retaliation and Reprisal False Claim of Lack of Knowledge of Disability or Reasonable Accommodations**

114.    In November 2018, when McGuire first assumed his supervisory position over Katz, Homer "Chip" McBrayer, who had been McGuire's predecessor as Acting Section Chief of the Command Center, personally advised McGuire that Katz had a brain tumor. that required accommodations. McGuire was informed that Katz's position in North Carolina was due to an Agency granted reasonable accommodation for these conditions.

115.    On February 27, 2019, Katz wrote directly to McGuire and advised him that due to his medical condition, he could not relocate from his current location in North Carolina.

116.    Following his surprise visit of March 14, 2019, McGuire critiqued Katz for not being was not on site. Katz informed McGuire that he had a reasonable accommodation for an identified medical condition which allowed Katz to work from home. [11]

117.    On March 14, 2019, although McGuire was fully aware of the fact Katz had reasonable accommodations, he demanded Katz prove both that he had a disability and that he had been granted reasonable accommodations for that disability.

118.    McGuire falsely claimed that he had no knowledge that Katz had a medical

---

[11] Ironically, McGuire had repeatedly numerous requests from Katz to set up meetings to discuss the CATS program and the issues surrounding it.

condition, although he had received emails identifying that condition, and he further falsely claimed that there was no proof that the Agency had ever granted Katz accommodations, including the assignment to North Carolina or telecommuting as needed.

119.   In point of fact, Katz's accommodations, had been approved by the highest levels of the Agency itself, were in writing and could have easily been confirmed by McGuire requesting to be advised by the health unit of the nature and extent of the accommodations.

120.   Nevertheless, McGuire personally demanded Katz provide proof of the accommodations. McGuire also made unauthorized inquiries into the nature and extent of Katz's impairments and questioned the nature of the accommodations themselves.

121.   McGuire made direct contact with health care officials in the Agency and its EEO office to try to question and defeat the need for accommodations.

122.   McGuire requested confidential and protected medical information and medical records related to Katz' condition and the accommodations Katz received.

123.   On March 21, 2019, McGuire claimed that he personally needed to see Katz; request because McGuire contended, he was personally unable to locate Katz' EEO paperwork. McGuire demanded proof of Katz' reasonable accommodation from Katz himself.  McGuire wrongly and falsely claimed the agency has no record of Katz reasonable accommodation requests and demands "all emails" and "supporting documentation related to the request".

124.   McGuire also wrongly and falsely complained that there was no telework agreement on file for Katz. McGuire failed to comprehend out of ignorance or intentionality, that approval of teleworking as a reasonable accommodation amounted to enough documentation of the approval of such an arrangement which is stated in the DEA Telework Procedural Guide.

**Retaliation and Reprisal: The Agency Abuses the EEO process itself**.

125.   Derek Orr is employed by the DEA to assist employees in obtaining reasonable

accommodations. He works in the Agency's EEO office.

126.    Orr is under federal EEO law, supposed to be a neutral who engages the employee in the "interactive process" as defined under the Rehabilitation Act.

127.    The interactive process involves a discussion between the employee, a health care provider and employer who share information about the nature of the disability and the limitations that may affect his or her ability to perform the essential job duties. This discussion is the foundation of compliance with the Americans with Disabilities Act.

128.    Faced with proof of existing reasonable accommodations provided to Katz by the senior most official of the Agency, McGuire pressured Orr to start demanding that Katz identify both his need for continuing accommodations and transfers to new positions outside of CATS.

129.    Katz repeatedly, consistently and explicitly objected to Orr's requests as retaliatory, a violation of EEO law and a perversion of the EEO process.

130.    Under the Rehabilitation Act once a reasonable accommodation is requested it can generally only be denied when it is an undue burden on the Agency.

131.    Further, whereas here the accommodation is already granted, it can only be withdrawn when circumstances render it an undue burden on the Agency.

132.    McGuire and others tried to circumvent these requirements by first challenging whether Katz had an accommodation and then trying to contend that he needed to renew his request to the DEA.

133.    When Katz protested these actions, McGuire next attempted to state that the CATS program needed to be transferred back to the Headquarters region.

134.    McGuire decision to have the CATS program relocate, was designed to remove Katz from his oversight over the program and punish him for his criticism of the award of the

program to DEA cronies, which he clearly made part of an IG complaint[12]. The mechanism of that retaliation, however, also included numerous violations of his rights under the Rehabilitation Act and the Agency's subsequent retaliation and reprisal involved responding to Katz's assertions of improper EEO based activities

135.     McGuire did not offer, nor did the Agency offer or provide, Katz a position in North Carolina. The Agency therefore sought to have Katz removed from the CATS program, it sought to force him to return to a Headquarters position.

136.     This had negative implications, under the DEA Career Progression Guide, a senior agent at the GS-14 level, does a single Headquarters tour before returning to the field to be considered for higher positions in the Agency. Thus, a return to Headquarters would be perceived as a demotion.

137.     Katz protested not simply his removal form CATS, but his reassignment away from North Carolina.

138.     Katz repeatedly stated that he needed continuing care from Duke for his tumor and thus any reassignment would be detrimental to his medical care and his physical safety.

139.     The Agency responded by making a series of repetitive requests to Katz to obtain medical information from his treating physicians to establish that he had or did not have disabling conditions.

140.     Katz protested these repeated requests as a de facto fitness for duty examination.

141.     Katz contended that the Agency was revoking his accommodations and had identified not only no undue burden, but no burden whatsoever for its actions.

142.     Katz also protested that the Agency was violating the fitness for duty examination

---

[12] The IG remains actively involved in the investigation of the award of CATS to both Cloud Lake and Compass.

process identified at 5 C.F.R. §339. 101, et. Seq., which governs requesting information for medical information related to the fitness for duty of any employee. Further Katz pointed out that the Agency was directly violating federal law related to fitness for duty exams, by failing to identify why Katz needed to provide such information.

143.    Katz was forced to repeatedly ask his treating physicians, at his own expense, to submit medical information detailing that he had a brain tumor, should not leave the Duke Medical Center vicinity for work and should be allowed telecommuting privileges.

144.    The lead Agency EEO official herself sided with Katz on this issue. On  March 28, 2019, Elizabeth Goode confirmed in writing that the EEO office had not been properly contacted regarding the issue of reasonable accommodations;   that Katz had properly been granted a reasonable accommodation by the Agency and that it could only be withdrawn if the Agency met its burden of establishing an undue burden related to the accommodation.

145.    Goode directly responded to McGuire, Derek Orr, the Reasonable Accommodation coordinator, to Deborah Lary, a registered nurse in the DEA Health Unit and to Uaida Eatkins, and Erek Davadovitch.

146.    Curiously, Goode also responded to Kasia Preneta, in the DEA's Chief Counsel's Office. Katz had filed a whistleblower reprisal complaint with the Office of Special Counsel for the actions taken by the Agency following his providing information to the IG. Specifically, he argued that the award of the contract to Cloud Lake and Compass violated federal law and that he was being retaliated against for his disclosures. Preneta was the counsel defending the DEA in its whistleblower case. After Katz exhausted his administrative remedies with the OSC, Katz filed an Individua Right of Action appeal before the Merit Systems Protection Board. Preneta acted as Agency Counsel for that complaint as well.

147.    Preneta left the DEA March 03, 2020 with the MSPB case still pending. The email

establishing that she was involved with questions related to the demands for medical information and the denial of accommodations, did not surface until just before she left the DEA, when her replacement counsel on the whistleblower action, faced with a threat to compel, produced the Goode email. The issue highlights that the DEA Chief Counsel's Office itself was an accessory to retaliation and reprisal. When this is viewed along with the fact that the Chief Counsel's Office failed in its obligation to properly vet and clear the Cloud Lake and Compass contracts, it makes clear that the legal office of the DEA, was a handmaiden to the retaliation and reprisal that Katz faced and it appears that Office was deeply involved in the negation of the EEO process itself and the violations of the Rehabilitation Act listed herein.

148.    Based on the email it appears that Preneta did more than act as counsel. She appears to have been part and parcel of the decisions to inappropriately demand Katz's medical information and appears to have helped determine the strategy to remove Katz from CATS program and engineer his transfer to DEA Headquarters. She also appears to have access to Katz's medical information, although that information was not part and parcel of his whistleblower claim. In sum, she did not act as counsel but as part of the team coordinating discriminatory and retaliatory responses to Katz assertion of protected rights and on the issue of whether to grant or deny continuation of Katz's then existing reasonable accommodation requests.[13]

149.    What is so probative about Goode's email is that Goode refused to act as a straw man in McGuire's attempts to misuse disability law. Goode correctly pointed out in her emails, that determination of the right to a reasonable accommodation is to be made solely on the criteria

_____

[13] The DEA has refused to respond to inquiries as to what Preneta's actual involvement was. Preneta also refused to answer a written inquiry demanding that she identify whether she was providing legal advice or assisting in decision making as it related to Katz and his EEO case. Preneta was specifically advised of case law and ethical matters that related to the her being a possible fact witness in the Katz matter. Neither she nor the DEA has tried to address the issue.

established under EEO law, that is whether the employee requests or could be supported by an accommodation that allows them to carry out the essential functions of their position or whether such a request would pose an undue burden, which the agency bears the burden of establishing.

150.    Goode also noted that the Agency could not use performance-based claims to address and accommodation and that such an accommodation was not conditioned on how well the employee was perceived to be doing their job.[14]

151.    Goode emphatically wanted McGuire, the Chief Counsel's Office, Mr. Orr and other Human Resources officials that the determination of "undue hardship" is an independent inquiry unrelated to disciplinary concerns.

152.    We should note that at no time did the DEA, ever establish an undue hardship.

153.    Instead, the DEA took a new tack. They bludgeoned Mr. Katz with requests for medical documentation to prove that he still needed accommodations and argued that he was being transferred to DEA Headquarters involuntarily for reasons never actually articulated.

154.    Although Katz was a represented party on this very issue, Derek Orr and Luke McGuire continued to demand he submit proof of need for accommodations, thus engaging in a de facto fitness for duty examination.

155.    Over repeated written objection, Katz supplied numerous medical opinions and information justifying his accommodations and recommending that he remain in the vicinity of his treating physicians and the Duke Skull Based Tumor Treatment Center.

156.    Faced with compelling medical evidence that Katz's accommodations continue, the DEA concocted an illegal scheme that flipped the Rehabilitation Act on its head.

---

[14] Katz had pointed out to the Agency repeatedly that EEOC Management Directive 110 bars Agency's from using officials involved in performance and conduct based adverse actions from also addressing the propriety of an EEO based claim.

157.    Katz's records were apparently forwarded to McGuire, Kasi Preneta, Derek Orr and others yet unknown.

**Violation of Rehabilitation Act: Improper Review of Medical Records and Reliance on Unqualified Medical Opinion to Deny Accommodations.**

158.    On July 03, 2019, Deborah Lary, a Registered Nurse in the Health Unit reviewed Katz's medical records from 2017 prior to his radiation treatments and determined, in a manner she *never* explained in writing that Katz's condition needed no accommodations of any kind and he was fully fit for duty.

159.    This preposterous, unsound assertion then formed the basis to allow the DEA to transfer Katz from North Carolina to DEA Headquarters.

160.    What made it even more absurd, is that Lary, as a Registered Nurse was precluded under Virginia law for rendering such an opinion. Virginia Code §54.1-2900 *et seq*. allows only licensed medical doctors to determine a diagnosis or prognosis of a medical condition and how to treat it. Nurses specifically have no such ability and certainly their opinions cannot outweigh those of a licensed medical doctor, particularly one who, as in Mr. Katz's case is a board-certified specialist in the very form of medicine being addressed.

161.    The Rehabilitation Act, incorporating the standards of the ADA, requires that employers rely on the best available medical evidence in making determinations on such matters as fitness for duty and the provision of reasonable accommodations.

162.    It violates these acts to rely on the surmise of persons not medically qualified to provide proper objectively based medical information on the determination of what disability an employee suffers and how the employer is to address or accommodate that disability.

163.    The conduct also falls below the proper standard of care set under the Virginia Code and may constitute negligence.

164.    Katz pointed all of this out in writing to the Agency. Which to date has ignored the request.

165.    On July 11, 2019, the DEA notified Katz that he was to report for duty at DEA HQ, in Arlington, Virginia for duty after issuance of transfer control numbers.  Until then he was to report to the Raleigh NC DEA office despite his medical accommodation for telework.

166.    When Katz checked with the Raleigh office, he was advised they had not requested his assignment and had few duties for him to perform.

167.    The Agency's actions caused actionable losses of leave and pay. For the period March 18, 2019 to April 1, 2020, Katz physical and emotional condition as a result of this threatened transfer, cause him to take 955 hours of leave.

168.    In addition, Katz suffered severe and continuous emotional distress as a result of the Agency's harassment.

### Hostile Work Environment and Constructive Termination

169.    On July 3, 2019, the Agency cancelled Katz's placement in North Carolina, after Health Services Unit Chief Deborah Lary reviewed Katz's 2017 medical records.  Notably, Lary ignored Katz's Doctors' communications (five separate letters) indicating that he should remain in North Carolina.  The actions of the Health Services Unit Chief Lary, resulted in Katz being transferred back to Headquarters in Arlington, Virginia.

170.    Despite Rehabilitation Act, requirements to the contrary, the Agency failed to inform  Katz of the decision that he was fully fit for duty , that his  reasonable accommodations were "null and void", or that he had the right to appeal such actions and provide contrary medical evidence. The Agency did this, although they were fully aware of Plaintiff's EEO complaint, the investigation of that complaint and the fact that Katz was represented by counsel who had invoked the "interactive process" of the Rehabilitation Act and the duties the Agency had on addressing

and FFDE and reasonable accommodation requests.

171.    On July 16, 2020, in an email regarding Katz's continuing need for the ability to work from home as an accommodation, Derek Orr stated, "I don't have any documentation that he was provided telework as accommodation."  This was despite the fact that ASAC Andrew Large had previously approved Katz working from home and that it had been provided the EEO office where Orr worked, in writing in March 2019.  McGuire was copied on the email sent by Orr.

172.    Also, on or about May 20, 2019, Orr advised Katz "In response to your email from May 24, 2019, I want to make it clear that I was not involved in any of the discussions that resulted in the CATS program being moved to HQ."  This was blatant lie as he was present in the meetings with Agency HR, McGuire, Lary, and Preneta as documented in the Goode email of March 28, 2019 where Katz's relocation was discussed.

173.    In July 2019, Katz supplied an additional letter from his Doctor a board-certified surgeon, to the Agency regarding his continuing need to be reasonably accommodated. The physician states Katz should stay in proximity of Duke University for proper medical treatment. The Agency never responded to this medical information, never countered it and informed Katz his involuntary transfer remained in place.

174.    On December 12, 2019 the DEA Career Board, transferred Katz to DEA HQ Staff Coordinator confidential source section. Katz did not apply for the new position himself, was not advised that he was being considered for the position and was not provided the opportunity to denote his existing reasonable accommodations, since the Agency claimed he no longer needed them. The transfer was clearly involuntary and was part of McGuire's retaliatory scheme  This occurred after Katz had filed his EEO claims and had repeatedly stated directly to McGuire, and the DEA, that he was facing discrimination, retaliation, reprisal and a hostile work environment based on his disability and his objection to the FFDE and the removal of his accommodations.

175.    The transfer of Katz also appeared to violate Agency practice. The Career Board normally handles promotions and transfers requested by Special Agents at the GS-14 and GS-15 level. Since Katz did not request the transfer, the transfer seems to have been forced upon him, and it is uncertain who sponsored the transfer and why it was made and granted.  The Career Board memo is addressed to DellaCorte.

176.    On information and belief, the Career Board has not transferred persons without their knowledge or consent, particularly in the face of a known disability.

177.     Faced with a transfer that ignored the requests of Katz for remaining in North Carolina, the information provided by his treating physicians that supported the accommodations and the resultant potentially life threatening nature of the transfer as impacting on his continued specialized care, Katz retired, from the Agency 7 years prematurely, in what can only be considered a constructive termination.

178.    Katz's noted that he was retiring early because of the harassment and hostile work environment he faced. As an 1811 Series Agent, Katz could work until age 57 before he was required to retire. Instead, Katz retired at age 50, again noting it was enforced and amounted to a constructive termination.

179.    The Agency appears to have known that Katz would turn 50, and thus be minimally eligible for law enforcement retirement in April 2020.

180.    Indeed, it appears the Agency's actions were designed to compel his departure. Katz's actual transfer and report date to Headquarters was delayed until March 15, 2020, and then April 1, 2020.

181.    Plaintiff's involuntary reassignment to Headquarters came during the outbreak of the novel corona virus, at a time when Arlington County, Virginia was experiencing the most confirmed cases of the novel corona virus per capita in the Commonwealth of Virginia.  Based on

his age and underlying medical conditions, Katz is uniquely vulnerable and is considered high risk for developing COVID-19, the disease caused by the novel corona virus.

182.    On or about March 31, 2020, to gain entrance into the physical office building where Katz was to report, permission from the Deputy Chief of Operations was required due to restrictions in place resulting from the pandemic.  Thus, on the day Katz was to report at Headquarters, had he reported to the building as instructed, he would have arrived to find the door locked with no one inside.  No one had informed Katz, either because no one really expected him to report, or everyone had simply forgotten about him.

183.    The agency management decisions concerning Agent Katz, were tainted by illegal discrimination based on disability and age.  This culminated in the constructive termination of an experienced and well qualified Special Agent and could have been avoided had the Agency engaged in the interactive process, instead of relying on Katz's own retirement eligibility to save the agency from having to accommodate him appropriately.  Katz now turns to this Court for redress.

**COUNT I**
**Violation of the Rehabilitation Act**
**(Failure to provide Reasonable Accommodation, and**
**improper removal of Reasonable Accommodation)**

184.    By this reference, Paragraphs 1 through 183 are realleged and reincorporated as if fully set forth herein.

185.    To establish a prima facie claim of failure to accommodate under the Rehabilitation Act, a plaintiff must demonstrate that (1) he was a qualified person with a disability; (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation. Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794.

186.     Katz was a qualified person with a disability, of which the agency had notice.  He had been successfully performing the essential functions of his position with reasonable accommodations in place.  When the decision was made to move the CATS program, the agency officials responsible for that decision realized that Katz's accommodation that he stays in North Carolina would be an impediment to their desired outcome.

187.     Additionally, rather than continue his accommodations, the agency insisted that Katz reapply for accommodation, without articulating why the need for continued accommodation was an undue hardship for the agency.  To the extent that the relocation of the CATS program was the basis for the hardship, it was a self-inflicted difficulty caused by the agency's own decision-making.

188.     Katz had been granted two separate reasonable accommodations which were arbitrarily removed.  Despite his repeated requests to have those accommodations remain in place, management official and those in the EEO program at DEA repeatedly asked for medical documentation to "justify" already existing reasonable accommodations, then when the medical documentation from his physicians made it clear removing the accommodations would threaten Katz' life, those same physicians' recommendations were ignored.

189.     The DEA clearly was aware that Katz was a person with a disability, who had been performing the essential functions of his job, and had been accommodated by the actual Administrator of the Agency, at the time the accommodation was granted.

190.     The Agency both failed to provide reasonable accommodations, when it improperly removed the accommodations, without any showing that the accommodations imposed an undue burden on the DEA.

191.     As a result of those actions, the Agency violated the Rehabilitation Act by failing to provide a reasonable accommodation, failing to continue those previously granted

accommodations, failing to engage in the interactive process regarding the removal of the accommodations, inserting the opinion of supervisors and non-licensed personnel to evaluate and then remove the accommodations and by placing the Plaintiff at a health and safety risk by its actions.

192.    The removal of the accommodations was done after the Plaintiff had invoked the protections of federal EEO law and was done in close nexus to the filing an assertion of protected rights. Thus the Agency actions were in retaliation and reprisal for protected activity and formed part of a severe, pervasive and hostile work environment, caused emotional distress, resulted in an involuntary transfer and forced retirement and caused Plaintiff to suffer actual damages, pain and suffering and the wrongful use, collection and dissemination of his medical information and records.

## COUNT II
## Violation of the Rehabilitation Act
### (Improper Collection, Use, and Maintenance of Protected Medical Information)

193.    By this reference, Paragraphs 1 through 192 are realleged and reincorporated as if fully set forth herein.

194.    Under the Rehabilitation Act, any "information obtained regarding the medical condition or history of the applicant" -- that is, medical information -- must be "collected and maintained on separate forms and in separate medical files and [must be] treated as a confidential medical record.  42 U.S.C. § 12112(d)(4)(B).  And, any "information obtained regarding the medical condition or history of the applicant" -- that is, medical information -- must be "collected and maintained on separate forms and in separate medical files and [must be] treated as a confidential medical record.  42 U.S.C. §§ 12112(d)(4)(B), 12112(d)(3)(B) and 12112(d)(4)(C).

195.    In 2019, Agency officials improperly contacted a physician at Stanford who last treated the Plaintiff in 2017.  Though the Stanford medical group contacted no longer treated the

Plaintiff at the time of the inquiry, the agency collected, used and disseminated this medical information in its illegal removal reasonable accommodations for Plaintiff.

196.    It also disseminated this information to supervisory personnel and to a person not qualified to analyze the data or make recommendations on its use or probity.

197.    As a result, the Agency, through an unlicensed professional, falsely determined that Katz required no accommodations at all and could be transferred to a position at DEA Headquarters in Arlington, Virginia. This was despite Plaintiff's physicians stating affirmatively that Katz's condition was of a type or kind that would require lifelong treatment, and specialized care, and also that more recent records were available from other providers.

198.    Katz's medical information was inappropriately shared with supervisors without a need to know it and is consistent with the Agency sharing information more broadly, and in a manner that is inconsistent with the protections required by the Rehabilitation Act.

199.    The Rehabilitation Act limits on the collection use and dissemination of medical information dictate that only those persons assessing the actual fitness for duty of Plaintiff or his need for accommodations be authorized to receive and review medical information. The Act further requires that the information be properly segregated and safeguarded, and treated as confidential, requirements that the DEA ignored.

200.    For example, on November 29, 2018, and February 12, 2019, Katz learned that his medical information had been improperly shared with individuals not authorized to receive it.

201.    On April 23, 2019, McGuire formalized a decision to relocate the CATS program, and in the same memo announcing this, also instructed *Katz to supply additional medical information* to him.

202.    McGuire falsely stated that 'we would like to engage in the interactive process with you, so that you may be reasonably accommodated" (emphasis supplied)

203.    Under the Rehabilitation Act of 1973 such a request for medical information should not have been instituted by a direct supervisor.

204.    At the time of the request Katz already had accommodations approved by the Agency and no legitimate issue had been raised as to the need for further medical information to justify the continuation of those previously approved accommodations.

205.    In addition, McGuire obtained and shared information related to Katz's medical condition to persons not employed by the Agency, who neither had a need to know, nor were engaged in the evaluation of Katz for provision of, or continuation of reasonable accommodation requests.

206.    These disclosures were of protected health and medical related information and constitute a breach of the Rehabilitation Act.  The Agency also failed to specify what measures would be taken to safeguard the information demanded and failed to appropriately prevent unauthorized people from learning the contents of protected records.

207.    The Agency lacked Katz's permission to share his protected information as broadly as it did, particularly as it related to his medical conditions and reasonable accommodation.

208.    The improper disclosure of protected information caused damage to Katz, in an amount to be proven at trial.

## COUNT III
### Violation of the Rehabilitation Act
### (Failure to engage in the interactive process)

209.    By this reference, Paragraphs 1 through 192 are realleged and reincorporated as if fully set forth herein.

210.    The DEA had an obligation to engage in the interactive Process with Agent Katz and had in fact previously engaged in the process.  Under that process, Katz had provided medical documents which supported his request for reasonable accommodation(s); the accommodations

were granted; and he had performed the essential functions of his position with those accommodations in place.

211.    In violation of both the protected medical information prong of the Rehabilitation Act and the EEO guidelines concerning the interactive process, the DEA demanded, under threat, medical records related to Plaintiff.

212.    Plaintiff protested these improper requests, and provided physician based statements reaffirming that Katz's could perform the essential functions of his position if granted a reasonable accommodation, and that his reasonable accommodation to be able to telework as needed and that he be stationed near Duke University's Skull-based tumor treatment center should both remain in place.

213.    Two of Katz's physicians wrote letters to the agency on multiple occasions in support of his continued need for reasonable accommodation.  Specifically, letters sent or about September 30, 2017, May 28, 2019, July 22, 2019, July 25, 2019, August 25, 2019 all were consistent with the conclusion that the reasonable accommodations then in place should remain due to Katz's medical condition.  These communications were disregarded by the agency in favor of opinions from a contract internal medicine doctor, who had never seen Katz in person, and whose opinion was evaluated by Chief Lary, a registered nurse.

214.    Katz's physicians expressed frustration with the DEA's repeated requests, which as noted below amounted to an improper Fitness for Duty Inquiry and also amounted to an improper collection, use and dissemination of protected medical information.

215.    The transfer of Agent Katz to DEA Headquarters ignored the interactive process, a as well as violated the duties imposed under the Rehabilitation Act Agency, as they apply to reasonable accommodations.

216.    The Agency did not include Plaintiff in the identification or the selection of a

vacancy in the DEA.

217.    Instead, it dictated a position to Plaintiff, demanded he transfer and removed any accommodations as a method to affect the transfer.

218.    This ignored both the Rehabilitation Act's reasonable accommodation and interactive process requirements.

219.    These actions were part and parcel of a hostile work environment, done in retaliation and reprisal for protected EEO based activity.

220.    As a result of these actions Plaintiff suffered harm, emotional distress and humiliation at the hands of the DEA and was subject to a transfer that put his health and safety at risk, which in turn, led to his forced retirement from the Agency.

**COUNT IV**
**Violation of the Rehabilitation Act**
**(Improper demand for medical documentation and examination)**

221.    By this reference, Paragraphs above are realleged and reincorporated as if fully set forth herein.

222.    An employer's request for a medical examination is job-related and consistent with business necessity, as required under the ADA, when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.

223.    In this case, Agent Katz did not request a reasonable accommodation, rather, he had already had two in place and was working successfully under those accommodations.

224.    The two Reasonable Accommodations were: first, he was given a reassignment to be placed in North Carolina as his duty station to be near treatment providers, and second, he was permitted to work from home when his symptoms from his medical condition warranted it.

225.    In March 21, 2019, when appropriate documentation of the reasonable

accommodations was given, it was ignored.

226.     In April 2019, Luke McGuire explored whether the Agency could claim that the accommodations were undue hardship. It appears that McGuire discussed the matter with Ms. Preneta, Deborah Lary and other DEA officials,

227.     On or about May 13, 2019, at the request of McGuire, Derek Orr, an EEO specialist who worked on Reasonable Accommodation issues wrote to Katz directly, although aware he was represented by counsel and had filed an EEO complaint. Orr repeatedly demanded medical information from Katz and ignored his attorney's objections. The information he sought amounted to a fitness for duty inquiry and exceeded the permissible scope of any legitimate inquiry. documentation on several occasions.   When pressed, Orr did not indicate why the medical documentation was needed, with whom it was to be shared, and why such a high degree of specificity was being demanded, despite direct requests from Katz and his counsel that he identify these matters.

228.     The Rehabilitation Act limits demands for medical information that are not consistent with a legitimate business inquiry that would arise from a request for an accommodation or a justified concern over the ability of the employee to perform the essential functions of their position, with or without accommodation.

229.     Despite these limits, Orr repeatedly demanded at the request of DEA management, that Katz submit confidential medical documentation to establish that he was fit for duty, with or without accommodations.

230.     Orr did not limit his inquiry to include any specified records and thus would have inquired into any psychiatric or psychological records as part of the scope of the inquiry.

231.     Orr, McGuire, Lary and others then turned the rights accorded to employees limiting Fitness for Duty Examinations on their head. The DEA conducted a de facto Fitness for

Duty Exam, by gathering medical records and then having a nurse declare Katz fully fit. They then ruled he did not need an accommodation and thus he could be transferred not only out of the CATS program but away from Duke Medical Center.

232. Katz repeatedly stated that the Agency was conducting an improper FFDE. He noted the Agency had not follow the requirements for conducting a FFDE set forth under 5 C.F.R. §339.101, *et. seq.* or the Rehabilitation Act. Katz noted the Agency was failing to pay for its requests for medical information and causing friction with Katz's treating physician. Katz noted the Agency had not justified its demands for medical information and had not shown that Katz was not performing his position or needed any change in the provision of his accommodations.

233. The Agency failed to respond to these objections, despite the fact it was apparently using Chief Counsel's Office, to coordinate the collection and review of protected medical information, the provision of an enforced transfer and the removal of accommodations previously granted.

234. Katz made his concerns over the participation of non-medical personnel in these actions known and pointed out that the Agency counsel who participated in the employment decision to transfer case, was also addressing his EEO administrative complaint. Katz noted such conduct violated EEO Management Directive 110, which prohibited Agency counsel who were involved in personnel actions from participating in the defense of the Agency in the EEO process. the gathered medical information not to determine whether Katz was fit for duty.

235. The illegal determination by unqualified personnel that Katz's accommodations could be removed, and he could be transferred against his will, were direct results of an illegal de facto FFDE. The fact that the Agency ignored uncontested medical evidence that Katz should remain near Duke for treatment and required accommodations was a violation of the Rehabilitation Act in its own right, constituted an improper collection, use and dissemination of protected medical

information, was an act of retaliation and reprisal for prior protected activity, was part of a hostile

work environment and led to the forced retirement of the Plaintiff.

236.    The same acts constituted an illegal and improper FFDE, of both Katz's physical

condition and his psychological condition, as the DEA provide no limits to its request.

237.    The DEA had no reason to believe that Katz was a danger to himself or others.

238.    The DEA's actions cause severe emotional distress, were per set violations of the

Rehabilitation Act and were done for a malicious and retaliatory purpose.

239.    The Agency would later state that its request was appropriate because Katz was

applying for an "enforcement position" was false, misleading and a pretextual fabrication. Katz

never sought a transfer and certainly never sought to be moved away from Duke.

240.    Based on the above, the DEA engaged in several improper demands for medical

information, declined to explain why the medical information was required, failed to provide for

payment of the examination to determine fitness for duty, and ignored Katz's treating physician's

warnings that removable of his accommodations could threaten Katz's health.  These actions by

the Agency were caused by illegal discrimination and reflect a violation of the Rehabilitation Act.

## COUNT V
## Violation of the ADEA

241.    By this reference, Paragraphs above are realleged and reincorporated as if fully set

forth herein.

242.    The ADEA states in relevant part: "All personnel actions affecting employees or

applicants for employment who are at least 40 years of age ... shall be made free from any

discrimination based on age." 29 U.S.C. § 633a(a).

243.    Section 633a further authorizes "[a]ny person aggrieved" to "bring a civil action"

for "such legal or equitable relief as will effectuate the purposes" thereof. *Id*. § 633a(c).

244.   The DEA engaged in multiple personnel actions, including transfers, reassignments, and modification of responsibilities which were not free "…from any discrimination based on age."

245.   Regardless of denials of knowledge by management officials, it is apparent due to his appearance and tenure at the agency that Katz is over 40.

246.   Because of his experience and age, Katz became eligible to retire from the DEA. This would be apparent to anyone who knew when he entered the training academy or was aware of his job history.

247.   When his involuntary reassignment was processed, he objected repeatedly. He made it clear the reassignment was against his wishes and provided medical opinions from his treating physicians that his reasonable accommodations should remain in place.

248.   The involuntary reassignment to DEA HQ was a personnel action.

249.   The involuntary reassignment and hostile work environment existing at DEA, forced Katz to retire from his position, and reflected a constructive removal of Katz from his position.

250.   Thus, Katz experienced events that were motivated by age discrimination, in that he was forced to retire. Retirement would only be an option for someone over 40.

**COUNT VI**
**Violation of the Rehabilitation Act**
**(Hostile Work Environment - Actual and Perceived Disability Discrimination)**

251.   By this reference, Paragraphs above are realleged and reincorporated as if fully set forth herein.

252.   The Plaintiff specifically incorporates each and every act identified in paragraph 13, as an action that formed and constituted a hostile work environment. The acts defined were

severe, pervasive, repetitive, done over written objection and designed to create a work environment so hostile, that no reasonable employee would have continued to remain employed by the DEA.

253.    As noted exhaustively above, due to his affliction with a brain tumor, Agent Katz experienced a medical condition which substantially affected his major life activities.

254.    Agent Katz's medical condition required extensive and highly specialized medical treatment, therefore Agent Katz is a person with a disability within the meaning of the §504 of the Rehabilitation Act, *et seq*., as amended.

255.    In addition, Agent Katz was a person "regarded as having … an impairment" within the meaning of 29 U.S.C. § 705(20)(B).

256.    At all times relevant to the Complaint, Agent Katz was otherwise qualified for his position.  He had also been provided a reasonable accommodation. Under the Rehabilitation Act, a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be "job related and consistent with business necessity." 42 U.S.C. §12112 (4)(A).

257.    By refusing to identify the request for "reasonable accommodation" to include an actual fitness for duty examination (FFDE) the Agency hoped to avoid triggering the rights and obligations mandated under 5 C.F.R. §339.101, et seq., covering FFDEs in federal employment and the Rehabilitation Act.

258.    Though he was granted a reasonable accommodation of his disability by the DEA Administrator, to remain stationed near Duke University, where his medical treatment was being overseen by specialists, this was ultimately revoked after a review of out of date medical records by Deborah Lary, a nurse.  Lary engaged in the process of determining the diagnosis, prognosis

and proper treatment plan of Katz, overruling board-certified physicians specifically trained in addressing the complexities of dealing with a brain tumor.

259.    Lary actions exceeded her charge under the Virginia Code. See sections 54.1-2902 (unlawful practice of unlicensed personnel); 54.1-2929- 2930 (Requirements for licensure). Only a licensed physician may engage the "prevention, diagnosis and treatment of human physical or mental ailments, conditions, diseases, pain or infirmities by any means or method", while nurses may only take action under the supervision of, and in consultation with, a physician.  *Id*.

260.    Lary, knew or should have known and the DEA, knew or should have known, that it was medical determinations in violation of the Rehabilitation Act. his reasonable accommodation based on medical hardship to stay near Duke University for treatment was no longer needed after reviewing a pre-treatment physical performed by a physician from 2017.

261.    The acts set forth in this complaint establish that Agent Katz was subject to a hostile work environment, which had the goal of forcing him to quit his employment.

262.    Requiring Katz to transfer away from Duke, forced him to either compromise his medical care or defy his employer, which would have resulted in disciplinary action.

263.    The DEA made no effort to evaluate whether Katz could or would receive comparable continuing care had he accepted the move to Arlington. Virginia.

264.    Agent Katz was transferred to DEA Headquarters and instructed to relocate to Arlington, Virginia.  Arlington, Virginia is an approximately 260-mile drive from Agent Katz's physicians at Duke University.

265.    Reasonably believing that his medical care would be severely compromised and his health impacted, a belief shared by his treating medical professionals, Katz viewed the Agency's cumulative and individual actions listed above and in paragraph 13 as a severe, pervasive and hostile work environment.

266.    The harassment also persisted when Katz went on sick leave in late 2019 and into 2020, due to his harassment.

267.    For example, while on approve sick leave, the agency contacted Katz repeatedly, requesting he account for equipment throughout his DEA tenure.

268.    The removal of a reasonable accommodation, without a showing of undue hardship, removal of all of his daily assignments, micromanagement of his actions, and creation of a hostile work environment, resulted in Agent Katz retiring from the DEA at his 50th birthday on March 31, 2020.

269.    But for the hostile work environment, Katz would have continued with his DEA career through age 57, the mandatory retirement date.

270.    The insidious of the Agency's actions is shown by the fact that the Agency did not merely transfer Katz, out of the CATS program, which he had helped create and develop and was a subject matter expert on, but that Katz was transferred to Arlington, Virginia.

271.    It was the geographic nature of the transfer that is inexplicable. Were the Aegncy truly legitimate in its motives, it would have transferred Katz to a position near Duke University.

272.    The DEA has an office in Raleigh, North Carolina, where Katz could have been accommodated. Although the transfer would still have been suspect, it would have not forced a "Hobson's Choice" on Plaintiff.

273.    The removal of all responsibilities, additional scrutiny and threatened performance actions, lowered performance rating and involuntary transfer, were humiliating for Katz to experience.  This also amounted to a constructive suspension, as it lasted more than 30 days.  It could also be construed as a constructive demotion, as when he did work, Katz was not performing work commensurate with his grade during this time.  Collectively these conditions under which Katz was forced to work constituted a hostile work environment.  Katz had to seek additional

medical treatments to address the stress placed on him and his family.

274.    Due to Katz's status as a qualified individual with a disability, who was able to perform the essential functions of his position, and the ensuing hostile work environment, constructive suspension, and humiliation and pain and suffering caused due to those conditions, were violations of the Rehabilitation Act.

## COUNT VII
### Violation of Title VII: Retaliation and Reprisal for Engaging in Protected EEO Activity

275.    By this reference, Paragraphs 1 through 274 are realleged and reincorporated as if fully set forth herein.

276.    Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any of his employees...because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

277.    Thus, Title VII prohibits discrimination because of opposition to illegal discrimination, and based on making a charge of discrimination.

278.    Katz was a qualified individual who had been granted a reasonable accommodation.

279.    Katz reasonable accommodation required that he be stationed near Duke University and that he be permitted to telework if symptoms from his brain tumor and treatments therefore caused him discomfort.

280.    Katz was in fact stationed near Duke University and performed the full duties of his position as staff coordinator.  Katz also teleworked and during periods of telework performed the full functions of his position.

281.    During February 2019, Katz was constructively discharged from his duties when

all his assignments were taken away, and contractors he was overseeing resigned or were fired due to the relocation of the CATS program.

282.    Katz filed an EEO Complaint alleging retaliation by Luke McGuire and Michael DellaCorte, who had through their concerted actions, wrested him from being able to perform any of the functions of his position.

283.    During March 2019, Katz was criticized by his supervisor McGuire, when McGuire made an unannounced visit to the CATS program remote site, and Katz was not present.  Katz explanation that he was teleworking, as he could do as part of his reasonable accommodation, was ignored.

284.    Having stripped him of all his duties, in April 2019, McGuire ordered emails from Katz requiring a list of all daily work activities, and notice "well in advance" of all leave requests. Being required to justify his LEAP pay and provide detailed information about whomever he spoke to in violation of DEA HR policy.  This additional scrutiny was in retaliation for a previously filed EEO complaint against McGuire.

285.    At the time of this increased scrutiny, Katz had already filed an EEO complaint against McGuire for his actions, of which McGuire was aware.

286.    Michael DellaCorte, McGuire's supervisor, also became aware of the EEO Complaint, which specifically named them both as officials who had engaged in actions that violated EEO rules.

287.    McGuire and DellaCorte played roles in the decision to move the CATS program to the DEA HQ, which had the purpose and effect of reassigning Katz.  This decision resulted in the removal of his reasonable accommodation and was done to retaliate against Katz.  But for the retaliatory decision to relocate the CATS program, Katz's reasonable accommodation could have continued without issue.

288.    Katz reassignment away from the CATS program, and involuntary transfer to DEA HQ were adverse employment actions. McGuire sought and obtained DellaCorte's approval of the paperwork necessary to push the transfer through.

289.    The removal of all of Katz' duties during March-April 2019 was for more than 30 days and therefore amounted to a constructive discharge.  This was also an adverse employment action.

290.    The agency then sought to have Katz "apply" for the reasonable accommodation, to again justify his need for it.  This was despite already having a reasonable accommodation in place.

291.    Katz opposed this improper "reapplication" process for his accommodation because one was already in place and he was satisfied with it.

292.    The Agency personnel assigned to process the "reapplication" for accommodation was Derek Orr, who had no apparent knowledge of the already existing Reasonable Accommodation approved by the Career Board signed by Administrator Robert Patterson.  (See Exhibit A – Email from Kelly Goode explaining the situation.)

293.    Katz believed references to a performance demonstration plan (PDP) and lowered mid-year rating were due to his protected EEO activity.  He advised McGuire as such in an email repeatedly and in person once (Exhibit B – Email objecting to sudden and intense scrutiny)

294.    Rather than appropriately respond to Katz's concerns, McGuire forwarded Katz's email to the Agency employee relations office and asks them to investigate if Katz's reasonable accommodation went through "official" processes.

295.    Katz further believes that he was incorrectly asked for additional medical information as part of the "interactive process" when in fact no such documents were needed.  At no point did the Agency articulate a job related, business necessity for an additional medical

examination.

296.     The revocation of an already provided reasonable accommodation, without the requisite showing of undue hardship, were acts of retaliation due to Katz's prior protected EEO activity.

297.     In the memorandum dated April 23, 2019, McGuire instructed Katz that "based on the assessment of the Cellular Abductor Tracking System (CATS) program" the CATS program was being returned to DEA HQ.   While asking "to engage in the interactive process" so that he could be reasonably accommodated, the memo also confusingly noted that there was already an accommodation in place.   In fact, there were two, but the memo does not state that.

298.     The April 23, 2019, memorandum did not articulate an undue hardship on the part of the Agency.

299.     Under existing EEO principles and the Agency's own procedures, the Agency needed to find an assignment with Katz's reasonable accommodation in mind.   The burden is not on Katz to locate a position for himself, nor is it his obligation to "reapply" nor to find an equivalent position for which he was qualified, though he did in fact attempt to find such a position.

300.     Nevertheless, the April 23, 2019 memorandum did not mention that remaining on assignment in North Carolina was an undue burden (despite that allegation being made in the prior email chain.)   Had the Agency already determined that they could not accommodate Katz, requiring additional medical documentation from him to justify his already in place accommodation is not an appropriate course of action, and violates Title VII, and the Rehabilitation Act.

301.     The Agency process for reviewing the Plaintiff's medical records was performed by Deborah Lary, a nurse registered in the state of Pennsylvania. Lary worked in Virginia at the time she rendered her opinion overruling the judgment of Katz's physicians. Virginia law does not

permit Nurses to supervise the practice of medicine by Physicians.

302.    Specifically, Virginia Code §54.1-3000 sets forth the duties of a registered nurse to include:

> "Professional nursing," "registered nursing" or "registered professional nursing" means the performance for compensation of any nursing acts in the observation, care and counsel of individuals or groups who are ill, injured or experiencing changes in normal health processes or the maintenance of health; in the prevention of illness or disease; in the supervision and teaching of those who are or will be involved in nursing care; in the delegation of selected nursing tasks and procedures to appropriately trained unlicensed persons as determined by the Board; or in the administration of medications and treatments as prescribed by any person authorized by law to prescribe such medications and treatment.

303.    Thus, under Virginia law a nurse may not render a diagnosis or prognosis or suggest a regiment of treatment, only a doctor may engage in the "Practice of medicine or osteopathic medicine" including the prevention, diagnosis and treatment of human physical or mental ailments, conditions, diseases, pain or infirmities by any means or method. Virginia Code Section 54.1-2900. It is a violation of law for a nurse to engage in the unauthorized practice of medicine. Va. Code 54.1-2902. Similarly, in Virginia, Nurses are not permitted to oversee a physician's treatment of patients.

304.    Despite at least three separate board-certified physicians, who are specialists in their respective fields, and collectively submitted five separate letters advising the agency that the Plaintiff should remain near Duke University for treatment of his medical condition, Ms. Lary determined that Katz was "fit for duty" and therefore could be transferred.

305.    According to agency employee relations personnel, this finding by Lary had the apparent effect of the Agency EEO office rendering all his prior accommodations "null and void."

306.    The revocation of the accommodation was predicated on the conclusion by a nurse that Katz no longer needed to remain near his treatment providers and could be transferred overruling the judgment of his treating physicians that he remains in North Carolina. This

conclusion was entirely inconsistent with the conclusions of his treating physicians.

307.    The Plaintiff thereby suffered two distinct and independent retaliatory actions:

  i.   The retaliatory actions by Supervisor Luke McGuire

  ii.  The actions by Health Unit Chief Lary, whose actions served to vindicate
       the retaliatory intent of others.[15]

308.    The Actions of McGuire and Lary constitute unlawful employment practices.

309.    The retaliation would not have occurred but for Lary's and McGuire's discrimination and unlawful employment practices.  These practices occurred because of Katz's protected activity.


## COUNT VIII: Constructive Discharge

310.    By this reference, Paragraphs 1 through 308 above are realleged and reincorporated as if fully set forth herein.

311.    A constructive discharge occurs when an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders,* 542 U.S. 129 (2004). When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge.

312.    A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign and that he did in fact resign. *Id.,* at 148.

---

[15] *See Staub v. Proctor Hospital*, 562 U.S. 411 (2010).

313.    The facts set forth above clearly illustrate that Plaintiff retired because of the intolerable work environment he faced.

314.    The choice for Plaintiff was stark, continue to face a hostile work environment and sacrifice his health or quit.

315.    The Agency must have known that their actions would trigger a retirement. Indeed, even sending Katz back to Headquarters was a slight.

316.    Under the DEA's Career Progression Policy, a DEA Special Agent is expected to serve at Headquarters and then report to the field.

317.    Returning Katz to Headquarters was a demeaning move, designed to signal he was in disfavor with the Agency and not promotable.

318.    The Agency also intended to place Katz in a position that had substantially less significant duties and would not enhance his skill sets.

319.    These acts were humiliating enough but when placed in combination with the health issues and extended history of harassment, it was and is clear that no reasonable employee would have remained.

320.    On April 1, 2020, Plaintiff retired from the Agency.

321.    As a result, Plaintiff, who suffered emotional distress and leave, lost seven years of pay and benefits, including investments in the thrift savings plan, medical benefits, loss of interest on pay and benefits,  reduced retirement benefits and loss of opportunity for advancement within the DEA all due to his constructive discharge.

## **Prayer for Relief**

For the above actions, Plaintiff is entitled to the following:

1.    Compensatory and exemplary damages up to the statutory maximum for each act of EEO based employment discrimination, retaliation and reprisal, and creation of a hostile work

environment as set forth in the allegations above.

2.      Front pay damages of seven years pay, including interest and benefits based on continued employment.

3.      Injunctive relief.

4.      Attorney's fees and costs related to the investigation, drafting and prosecution of the allegations cited above, including for the prosecution of the administrative complaints cited herein.

5.      For other such relief as is just and proper under the circumstances.

6.      Plaintiff hereby demands a jury trial.


Respectfully submitted,


By: *s/ Kevin E. Byrnes, Esq.*
Kevin E. Byrnes, Esq., VSB No. 47623
**FH+H**
1751 Pinnacle Drive, Ste 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
Kbyrnes@fhhfirm.com
E-file@fhhfirm.com

*Counsel for Eric Katz*