**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| ERIC J. KATZ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-554 (TSE/JFA) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW A IN OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# I.     INTRODUCTION

Eric Katz was a highly respected General Series 1811 ("GS-1811") Supervisory Special Agent of the Drug Enforcement Administration ("DEA" or "Agency"), who had the unfortunate luck of developing a rare brain tumor requiring specialized treatment available only at certain facilities, and due to its type and location near his brainstem, imperiled his hearing and balance. DEX 6 at 1, DEX 12 (sealed). Katz requested, and was granted, two reasonable accommodations for his disabling condition by the Agency. DEX 8, DEX 10. Those reasonable accommodations were later revoked, without explanation and contrary to DEA's own policies and procedures. This lawsuit seeks appropriate relief for the damage done but that improper employment action.

Katz's first reasonable accommodation, reassignment to a non-enforcement position and relocating his duty station to North Carolina to be near Duke University Skull Based Tumor Center, was granted by the Acting Administrator of the Agency Robert Patterson October 10, 2017. DEX 8. Later, on October 30, 2017, Katz's supervisor Andrew Large granted him a reasonable accommodation to telework "as needed." DEX 10 at 2, 3. Given that Katz was working on development of a technological product, the Cellular Abductor Tracking System ("CATS"), which he created and developed for the Agency, apparently both Administrator Patterson and Large, felt Katz's work was significant enough and his condition serious enough, to provide him these reasonable accommodations, while continuing to allow him to perform the essential functions of his position. DEX 8, DEX 10.

In late 2018, Katz was assigned a new supervisor, Luke McGuire. Friction between Katz and McGuire developed quickly, and within a short time period, the DEA decided to remove Katz from the CATS project. DEX 16, 18. Consistent with his reasonable accommodations, Katz sought

to remain in North Carolina, close to Duke, in order to continue access to life-saving treatment.[1] The DEA never clearly stated why Katz' reasonable accommodations were revoked, at no time in the long administrative or District Court phases of the case did the Agency state or explain how the geographic accommodation for specialized medical treatment presented an "undue hardship" to an agency with a $50 billion budget. Nor did the Agency clearly state how or when it had truly decided it should "revisit" Katz's reasonable accommodations and engaged in the interactive process in a manner inconsistent with its own policies. DEX 3. Additionally, the record that was developed showed that the DEA ignored the advice of its own EEO Director, ignored the medical records provided by Katz, ignored Katz' physicians' and attorneys' requests to engage in the interactive dialogue directly as required by the Rehabilitation Act of 1973, and relied upon unqualified personnel to render determinations as to the nature and sufficiency of the medical information put forth to them supporting his continued reasonable accommodation.

What is truly troubling about all this, is that a federal law enforcement agency, which exposes its GS-1811 special agent personnel to dangerous conditions and has demanding physical standards, would so cavalierly, if not maliciously, ignore federal law and repeatedly ignore its own policies concerning assessing and providing reasonable accommodations and obtaining and reviewing medical information for that purpose. Rather than assist an agent with a clearly identified disabling condition, the DEA chose to treat its obligations as a game, manipulating the process to achieve the desired end of driving Eric Katz from its ranks. Whether by ineptitude or design, the Agency's actions violated the law and bode ominously for other agents who develop

---

[1] Katz alleged the removal from his oversight of the CATS program arose from whistleblowing activities arising out the contract award and staffing of the CATS program, away from a recognized 8(a) contractor to a company staffed almost solely by former DEA supervisory personnel. Due to the Byzantine nature of federal personnel law, the whistleblower claims were pursued before the Merit System Protection Board ("MSPB"). The EEO claims, centered on the revocation of Katz's reasonable accommodations and his forced reassignment back to DEA Headquarters.

impairments and need reasonable accommodation.

Against this backdrop, the Defendant advanced no credible defense based on any articulated undue hardship, and never adequately stated *even a single affirmative defense in its own Answer*. During the long and tortured history of this case, the DEA ignored its obligations by contending, for the first time, that Katz's continued reasonable accommodation was an unspecified "undue hardship", and that Katz failed to cooperate in the interactive process. What is left unaddressed in all of this, however, is how and why Katz was suddenly subjected to such scrutiny, and later declared capable of transferring away from Duke on the untenable and medically contradicted claim that his reasonable accommodation was revoked and no longer necessary. The Fourth Circuit has held that an employer's failure to engage in the interactive process which resulted in the failure to identify an appropriate accommodation for the qualified employee can form the basis for a claim that the employer failed to reasonably accommodate the employee. *Walter v. United Airlines, Inc*., 232 F.3d 892 (4th Cir. 2000). Based on the evidence, a reasonable fact finder could find, and may be impelled by logic to find, that the Defendant failed to reasonably accommodate the Plaintiff, he was retaliated against, and he was constructively discharged. Accordingly, the Defendant's Motion for Summary Judgment ("MSJ") must be denied.

## II.   <u>LEGAL STANDARD</u>

In evaluating the MSJ, if, after reviewing the record as a whole, and seeing all evidence in the light most favorable to the nonmovant, the Court determines a reasonable juror could find for the Plaintiff, summary judgment is improper. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Trial court should not act other than with caution in granting summary judgment and may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. *Id*.

Longstanding Fourth Circuit precedent holds that summary judgment is appropriate only

4

when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citation and internal quotation marks omitted). In addition, "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (citation and internal quotation marks omitted). Further, "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. (citation and internal quotation marks omitted). The burden on a party moving for summary judgment is significant. When evaluating a motion for summary judgment, "[Courts] are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party...." *Id*. at 312. In doing so, courts must not weigh evidence or make credibility determinations. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).

In this district, prior courts have determined that, "The McDonnell Douglas test is inapposite in a failure-to-accommodate case because a failure-to-accommodate case does not require proof of the employer's motives." Newcomb v. City of Newport News, 549 F. Supp. 3d 458, 465 (E.D. Va. 2021). Citing *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954 n.2 (4th Cir. 2021) (quoting *Punt v. Kelly Servs*., 862 F.3d 1040, 1049 (10th Cir. 2017)). In addressing a failure-to-accommodate claim on an employer's motion for summary judgment, the court instead only decides whether the evidence, viewed in the light most favorable to the employee, is sufficient to support jury findings that (1) the employee was an individual was an individual with a disability within the meaning of the ADA; (2) the employer had notice of the disability; (3) the employee could perform the essential functions of the position with reasonable accommodation; and (4) the employer refused to make such accommodation.[2] *See Jacobs v. N.C. Admin. Office of the Courts*,

---

[2] The parties agree that the standards of the ADA, as amended, are the same as those under the

780 F.3d 562, 579 (4th Cir. 2015). *See also Newcomb v. City of Newport News*, 549 F. Supp. 3d 458, 465 (E.D. Va. 2021). *Wilson v. Dollar Gen. Corp*., 717 F.3d 337, 345 (4th Cir. 2013), *Rhoads v. Fed. Deposit Ins. Corp*., 257 F.3d 373, 387 n. 11 (4th Cir. 2001) (*quoting Mitchell v. Washingtonville Cent. Sch. Dist*., 190 F.3d 1, 6 (2d Cir. 1999)). *Cole v. Fam. Dollar Stores of Maryland, Inc*., 811 F. App'x 168, 176 (4th Cir. 2020). Accordingly, a plaintiff who can provide evidence of each of the four elements in a failure to accommodate claim should survive summary judgment and proceed to trial.

### III.   <u>OVERVIEW</u>

The Defendant had a reasonable accommodation policy with several requirements the Defendant failed to meet. DEX 3. Once an accommodation has been granted, under applicable DEA policy, it can only be revoked if the agency demonstrated continuing accommodation would present an "undue hardship" identified by the decision-maker and approved by "the Office Head or his/her designee." DEX 3 at 13. Per the EEOC guidance on the regulations, "'Undue hardship' means significant difficulty or expense and focuses on the resources and circumstances of the particular employer in relationship to the cost or difficulty of providing a specific accommodation."[3] Furthermore, where reassignment is provided as an accommodation, as it was here, then to discontinue the assignment is a revocation. An application for reasonable

---

Rehabilitation Act of 1973. Interpretive guidance on the ADA states, "In addition, unless expressly stated otherwise, the standards applied in the ADA are intended to provide at least as much protection as the standards applied under the Rehabilitation Act of 1973." 29 C.F.R. § Pt. 1630, App.

[3] "*Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA*" EEOC, https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#N_36_ (last visited November 6, 2022). *See* 42 U.S.C. § 12112 (b)(5)(A) (1994) (it is a form of discrimination to fail to provide a reasonable accommodation "unless such covered entity can demonstrate that the accommodation would impose an undue hardship . . ."); *see also* 42 U.S.C. § 12111(10) (1994) (defining "undue hardship" based on factors assessing cost and difficulty, as well as significant operational disruption).

accommodation is submitted via a DOJ Form 100A, an approval is provided for on a DOJ Form 100B, and a denial of an accommodation is supposed to contain the reasons for the denial in a DOJ Form 100C. The DOJ Form 100C is "Mandatory for all decision makers." DEX 8 at 2.

## IV.   PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS (MSJF)

1.      For MSJF ¶1 Plaintiff does not object to the quoted material but does object to any attempt to incorporate material from the identified website, which is not specifically mentioned or quoted, and Plaintiff otherwise objects to incorporation by reference of the balance of material from the identified website which is not referenced specifically.

2.      With respect to MSJF in ¶2, the Plaintiff notes that he was performing the "…duties of a Special Agent 'frequently require irregular, unscheduled hours," which did "involve personal risks, exposure to all kinds of weather, arduous physical exertion under rigorous and unusual environmental conditions, operation of an automobile, and considerable travel," while under a medical advisory.

3.      MSJF in ¶3 is not a fact but a summation of what the Agency believes its standards should be, but Plaintiff disputes that those standards are always applied uniformly.

4.      MSJF in ¶ 4 is disputed. DEA mobility policy is not material or relevant to any matter at issue. The Agency never stated it was relying on this mobility policy in any reassignment at issue in the underling EEO investigation. The DEA cannot argue that a mobility policy negates federal law. An agent would not have to accept, without objection, a reassignment that was based on retaliation for protected status or protected activity. Plaintiff notes that the agency never proffered as part of any defense, any claim that it was assigning Katz for the specific purpose of consistency with the mobility agreement. Indeed, it remains uncertain from the conflicting testimony of McGuire, DellaCorte and Cherundulo, who actually requested that Katz be reassigned

to Northern Virginia or why. As the Agency has established Career Board Procedures for such assignments, the claimed "fact," is not part of any claim or defense.

**DEA's Reasonable Accommodation Policy**

5.      MSJF in ¶¶ 5, 6, and 7 involve a summation and opinion by the Agency as to what its policies meant. As the facts established in this case show, Mr. Katz was provided a reasonable accommodation by DEA Acting Administrator. DEX 8. The Plaintiff's telework accommodation was personally approved by Plaintiff's supervisor, Ferdinand "Andy" Large, with assistance from Goode who relied on guidance from Ms. Goode. DEX 10. To the extent the Agency seeks to highlight this fact to support a claim, it ignores that the DEA did not follow its own procedure in granting the accommodation and appears to misstate that it actions with respect to the withdrawal of the Katz reasonable accommodations.

6.      MSJF in ¶8 is disputed, the policy summarized by the Defendant applies to seeking an accommodation, this case involves the unilateral and unexplained revocation of an existing accommodation. Further, the document speaks for itself and is not a fact, but merely a selective statement of the Agency's understanding of its own duties. That policy also states, "These procedures are not intended to include or restate all applicable laws, regulations, Executive Orders, directives, policy statements, or binding legal precedents that set for the substantive requirements governing such requests or that may affect the processing of such requests, and should be implemented in a manner consistent with such authorities." DEX 3 at 3.

7.      MSJF in ¶¶ 9-10 are not facts but the Defendant's summary of its policies. These policies do not establish "facts" in and of themselves, they merely state what the Agency interpreted its legal duties to be. Obviously, the Agency cannot adopt a policy that varies with federal law nor limit its reach. Additionally, these "facts" are not material or pertinent to this action. The policies reflected deal with a *prospective* reassignment as a reasonable

accommodation. The issue in this instance is the withdrawal of an existing accommodation and the propriety of an agency forced reassignment that was specifically imposed on Plaintiff, over his objection and not part of any reasonable accommodation dialogue. Further, it should be noted that the Defendant imposed the transfer because it contended the Plaintiff no longer needed any accommodation at all.

**Eric Katz's Tenure at DEA**

8.      MSJF ¶14 is supplemented to include that Katz specifically created and designed the CATS program and oversaw the development of its technology. DEX 4 at 33. Plaintiff was the only subject Agency matter expert on CATS, having both designed and built the program "from scratch." MSJ at ¶12, DEX 4 at 33. DellaCorte's claimed reasons for advertising the position are not a fact but an opinion, there is no documentary support for the contention that "transparency" was at issue and the term is not a fact-based claim but an opinion. Factually, given Katz's knowledge there was objectively no other agency employee with equal or subject matter expertise, knowledge or experience with the program that the Plaintiff.[4] Ultimately these "facts" are irrelevant since Katz was selected for the position.

9.      MSJF ¶15-16 is disputed as being immaterial or irrelevant. The Defendant has never claimed that Katz's actual initial assignment to North Carolina was improper or not related to his reasonable accommodation request. Further, though nonenforcement positions *should* not have included physical exertion or the potential for confrontation sometimes they did. PEX 33 at ¶3.

10.     MSJF ¶17 is not a fact but an incomplete summary of the statements offered by the

---

[4] It should be noted that DellaCorte had recently completed transferring 2 GS-1811-14s with a memo to similar positions within FEMA without advertising them and no competition or transparency, providing them with vehicles and full PCS transfer with no competition was not something done with predictable certainty. PEX 33 at ¶6.

Plaintiff's treating physician. The document is the actual factual evidence and Plaintiff disputes any characterization of the document that varies from its contents. The document also made clear that post-treatment side effects could persist after the indicated fractionated radio surgery treatment, and "Due to its locations between the brainstem and cochlea a submillimeter miscalculation can cause significant medical issues." Importantly, if further surgical intervention became necessary, the Duke University Skull Based Tumor Treatment Center specialized in the unique procedures to do so. DEX 6 at 2.

11.    MSJF ¶18 is disputed as immaterial, incorrect and irrelevant. On September 9, 2017, the Plaintiff submitted documentation requesting, among other things, a transfer to a non-enforcement position. DEX 6. The September 9, 2017, memo noted, "As a result of the treatment, DC Katz has already begun to experience side effects that will most likely continue to worsen as the tumor reacts to treatment. Given DC Katz current condition, and until full remission is achieved when he can return to enforcement related activities, the Neurologist at Stanford University recommends against extended commuting for work or medical care. On September 13, 2017, while undergoing radiation, Plaintiff advised his immediate supervisor of the brain tumor diagnosis who in turn requested permission from Plaintiff, and then notified DellaCorte of his intention to apply for an accommodation.  DEX 6 at 1. PEX 1.

12.    MSJF ¶19 and 20 are disputed. Plaintiff was not required to report to Charlotte, because the Defendant granted Plaintiff an accommodation pursuant to his request. DEX 8, DEX 10. The reasons for Plaintiff's request is set forth in detail in his actual requests. This request was submitted at the direction of the EEO Director Kelly Goode. Plaintiff also notified his chain of command both verbally and in writing, including the email DellaCorte has testified he does not remember receiving. DEX 6, PEX 2, 22:17-25, 23:1-4. The selection of the Fort Bragg facility was

4

not related to Plaintiff's reasonable accommodation request and was approved by Michael DellaCorte.

13.     MSJF ¶ 21 is disputed. Plaintiff began the accommodation process through Ms. Goode on September 9, 2017. DEX 6. On September 29, 2017, Katz submitted DOJ Form 100A, to Ms. Goode in conjunction with her advice. DEX 8.

14.     MSJF ¶22, is objected to as it reflects an incomplete excerpt of a document which is the best evidence, and Plaintiff supplements to note that the reasons for Mr. Katz's request and its approval are set forth in DOJ Form 100A and DOJ Form 100B, October 31, 2017. DEX 10 at 2.

15.     MSJF ¶ 23 is not disputed as it relates to when McGuire became Katz's supervisor, and objects to the reference to inclusion of Katz medical documentation as that was not requested by the agency at the time and was produced only in this matter subject to a protective order.

16.     MSJF ¶25 is disputed and combines two disparate "facts," which are disputed. First, there is no evidence McGuire conducted any contemporaneous formalized or even written "assessment" in any communications to Michael DellaCorte, to Eric Katz or to anyone and this issue arose only while McGuire was defending himself against claims. Second, McGuire by his own admission lacked the technical expertise to do so. Additionally, McGuire never advised Katz, nor Compass Strategy Solutions, LLC ("Compass") of any concerns over Bordanaro or Guerra's hours. Nor can McGuire state how Firebird usage by contractors was mandated by any DEA policy as alleged and Firebird is not a "software program" it is the DEA's intranet.

17.     MSJF ¶26 is disputed. McGuire's claims were not supported by a documentation and are a matter of his opinion, not undisputed facts. First, McGuire, has no memory of reporting his concerns to Compass, the actual contractor legally responsible for Guerra or Bordanaro's work,

work ethic, hours, scope of work or any other concern over their conduct or performance at any time. PEX 4, 36:21-22, 37:1-3. In January to February 2019 when McGuire expressed concerns over the contractor's being outside the scope of work, this was also disputed. PEX 3. McGuire had Bordonaro terminated from the Compass contract as a result of Bordonaro insisting that McGuire was incorrectly asserting the contractors were working out of scope. PEX 3, PEX 5. McGuire did not appreciate Bordonaro's pushback or defense and took measures to have him terminated by his employer. PEX 2, 3, and 5.

18.    MSJF ¶27 is disputed and reflective of McGuire's opinion, not facts. McGuire's statements are not supported as he never raised any issue to the actual contractor regarding the work of the contractors and when he asked Katz about their work, Katz informed him as to what the contractors were doing and where. In discussions with Compass regarding removing Bordonaro, McGuire raised only the issue of Bordonaro's perceived insubordination. As the Affidavit of Zoran Yankovich filed in a subsequent civil action affirms, McGuire did not raise any other concerns and Compass was unaware of any. PEX 5.

19.    MSJF ¶28 is disputed and incomplete, as it omits the Plaintiff's full response to McGuire's inquiry. Katz testified that he regularly spoke to the contractors daily, multiple times a day related to their work on the program and saw the work product that resulted from those conversations. PEX 6, 132:6-17. Bordonaro later stated in an email to McGuire, "I've been working for Eric on this program for the better part of the last 6 years and never once did I feel as if I did not understand my marching orders with a very fine degree of granularity It needs to be noted that his hands on management of the program and the contractors has never wavered *even when he was diagnosed with a brain tumor*." (Emphasis in original.) PEX 3 at 2.

20.    MSJF ¶29 is disputed as McGuire's opinion, and to the degree it implies Katz was

6

responsible for the lack of formalized agreement or funding approvals, Plaintiff objects to that implication. McGuire mistakenly conflates the issue of a formal MOU with permission from the Army to use the space itself. The Army had obviously granted the DEA permission to use the space, because it was using that space at the time. McGuire's supervisor, Michael DellaCorte knew CATS operated out of Ft. Bragg and approved that location and any payments for the project. There was no funding denial of any build out at issue. The U.S. Army was not charging the DEA for the use of the space. McGuire could also point to no regulation that required an MOU. McGuire's realization as stated in MSJF ¶29 is not a fact but an opinion, subject to verification not at summary judgment but at trial. PEX 33 at 4. Finally, McGuire admitted any MOU would not have been Katz' responsibility, "The issue with the MOA, or lack thereof, or MOU, or lack thereof, against, I didn't hold Katz responsible for not having it in place." PEX 4 214:13-22. Yet in his midyear did exactly that, stating under "Performance Deficiencies" that Katz failed to put MOU/MOA in place and lowered his rating and threatened to place him on a performance improvement plan. PEX 38 at 3. Katz objected to the review in writing and filed his formal EEO complaint April 17, 2019. Second Amended Complaint ("SAC") Ex. A.

21.    MSJF ¶30 is disputed as merely McGuire's subjective, pre-textual recollection. There is no contemporaneous documentary evidence to support this contention. Nor did McGuire produce any documentary evidence to support the contention that he wished to the CATS program back to Northern Virginia due to a lack of an MOU. First, it was not Katz' responsibility to secure an MOU as he was merely a GS-14 without delegated authority to do so. PEX 4, 160:20-21. PEX 30a. Second, there was an existing MOU for certain Personnel Recovery activities between the Department of Defense and the DEA, which McGuire either lacked knowledge about or had disregarded. PEX 30b – Filed under Seal. Third, there was an MOU from August 2017 under

7

consideration by the DEA which apparently was never finalized but should have been signed by Michael DellaCorte and apparently was not. PEX 33 at 4. PEX 30a. Further, McGuire never notified Compass in advance of his decision to transfer the program. PEX 4, 37:14-22, 38:1-3. McGuire did notify Ed Wezain in advance, a contract employee for Compass, who promptly quit due to the relocation. PEX 7. After notice of the transfer Jenna Guerra resigned. PEX 8. Mr. Katz was taken off the CATS program on March 15, 2019, and not allowed to speak with anyone regarding the transfer of the program, nor could he brief anyone regarding his work. PEX 33 at 7 and 8. PEX 9 GARLAND 3903-3904. The program languished after these actions and at some point was simply ended. McGuire also made no provisions to have personnel in place in Northern Virginia at the time of the transfer of functions. These facts undermine his explanation. PEX 33.

22.     MSJF ¶31 is disputed as it is an inaccurate statement of what occurred, and sequence of events should be supplemented as follows: Hunter asked via email that task monitors complete training but gave no date certain for doing so. DEX 13 at 1-3. Hunter granted extensions to other monitors for additional time to complete the training, but not Mr. Katz. *Id* at 3. No specific "federal law" has ever been cited by Hunter, at the time he was relieved of being a task monitor as of February 5, 2019, Plaintiff had completed two of the three required training modules. *Id*. at DEX 13. PEX 28. The modules required up to eight hours of blocked time and Plaintiff informed Hunter he was experiencing fatigue when conducting the training. *Id*. at 1. Hunter failed to respond to the request and instead forwarded it to McGuire who later responded by removing tasks monitor duties from Katz. *Id*.

23.     MSJF ¶32 is disputed, except for the fact that McGuire visited Ft. Bragg on the date identified, which is undisputed. McGuire has given several reasons for the visit over time and there are no contemporaneous documents to support his belated assertions in depositions. PEX 4, 166:2-

22, 167:1-10. McGuire drove an SUV with Mina Hunter some six hours to Ft. Bragg. His stated reason was to conduct an exit interview with Ed Wezain, who was resigning after McGuire had previously informed Wezain he was relocating the program. PEX 4, 272:5-17. Wezain was a government contractor, not a federal employee.[5] Apparently the exit interview of a non-employee, required a 12-hour expenditure of time for two full time federal employees, who never informed the contractor itself, Compass, of their visit or its purpose. Instead, McGuire packed up all of the DEA equipment he could locate and transported it back to Virginia, rendering it impossible for Jenna Guerra to continue her work causing her to resign. PEX 7. Thus, any claim that McGuire was still evaluating the program is disputed and his visit closely followed Katz' EEO complaint. *Id*.

24.     MSJF ¶33 is contested and objected to because it is unclear who the true "decision maker" was for the relocation of the program, and who made the decision, when and why. McGuire testified that, "I made a recommendation based on my assessment to my first line supervisor who concurred with my recommendation." DEX 11 at 16. ECF No. 90 at 18. However, at the time McGuire sent a March 21, 2019, email where he stated, "I have determined that it is in the best interest and needs of the CATS Program and the DEA as a whole to have your position reassigned to the local Headquarters area." DEX 16. Though the Plaintiff was the agency's foremost expert on the CATS Program, McGuire reached this decision without ever meeting with the Plaintiff or speaking with him on the phone about the CATS Program or how to manage its relocation while preserving institutional knowledge. PEX 33 at 7. PEX 7.

25.     MSJF ¶34 is not a fact but a summation of Plaintiff's motives by McGuire, it is therefore opinion. Factually, McGuire removed all of Plaintiff's job duties and left him with no

---

[5] It should be noted that Katz had previously complained of Wezain's lack of expertise in writing in an assessment of the contracting personnel done in late 2019. PEX 10 at 2. PEX 33.

work to do and no staff to coordinate. PEX 4, 281:13-282:4. PEX 8. Nevertheless, McGuire demanded Plaintiff account for his daily activities, in a move that numerous witnesses stated was unprecedented and humiliating to Katz, yet still required daily job reports of all the Plaintiff's activities. PEX 4, 28:1-10, 232:2-5. McGuire acknowledged the Plaintiff was constructively demoted during this time period, claiming oddly that, "I couldn't find any work for him." DEX 11 at 27, 28. McGuire, not the Plaintiff, was responsible for the lack of productive employment. He not only did not find Katz any other positions, he found him no work at all, not even coordinating the continuity and transition of the CATS program Katz created. McGuire also did not coordinate his efforts within the Agency itself and regarded finding a reassignment as Orr's responsibility. PEX 4, 290:4-5. PEX 11, 114:21-22, 115:1-10.

26.     MSJF ¶35 is disputed as opinion testimony and not a fact. DEX 17 reflects that McGuire waited more than two months to contact other place Plaintiff in a new role and that his efforts were minimal at best. McGuire did not claim he was seeking to accommodate Plaintiff and in his requests merely stated he had an agent who needed a temporary assignment. DEX 17. McGuire never assisted Katz's or consulted with Katz in seeking a new assignment and the Agency did not make Katz or his counsel aware of such efforts. *Id*. Indeed, at no time did McGuire discuss with Katz any reassignment opportunities, although clearly required by the interactive process and agency policy. DEX 3. PEX 4, 292:12-18.[6] And as noted above, he gave Katz no work yet required daily reports from him. DEX 15, DEX 16. McGuire also made no effort alone, or in conjunction with Derek Orr to look outside of DEA in other Justice Department components or in the federal government as a whole as was required by DEA policy. DEX 3. PEX 4, 321:11-16.

---

[6] When asked, "What positions did you offer, did you engage in an interactive dialogue with Mr. Katz on acquiring, what specific positions did you say, Mr. Katz, let's have a discussion about what positions you're qualified for?" McGuire testified that, "I did not have any of those conversations or communications."

27.     MSJF ¶36 is disputed and is opinion. The reasonable accommodation reassignment to Fort Bragg also carried with it a specified title and position. DEX 8, DEX 10. Katz, who had been serving as the Deputy Chief of the Command Center/Crisis Preparedness Section (OMC) in the Office of Operations Management in the Headquarters of the DEA, became the Staff Coordinator. DEX 8. Katz' reasonable accommodation was "reassignment to another job" as Staff Coordinator, and Fort Bragg was his duty station. DEX 8 at 4. Thus, McGuire's subjective belief that the reasonable accommodation reassignment was "a separate matter from the program" is contested.

28.     MSJF ¶37 is disputed as hearsay, that McGuire "heard" something about a condition is not a fact. Alternatively, Homer "Chip" McBrayer testified he personally told McGuire about Katz's diagnosis and reasonable accommodation in November 2018. PEX 12, 117:5-11. Bordonaro had spoken about Katz' diagnosis with a brain tumor in an email to McGuire also on February 6, 2019. PEX 3. The Plaintiff had requested as early as February 27, 2019 that McGuire indicate what his plans for the program as he could not relocate due to his medical situation. PEX 7. PEX 13, 130:13-16. PEX 33 at 6. McGuire instead tried to question the existence of the accommodation itself. He decided to email an HR representative, "When you have time, please check to see if his accommodation was routed through and officially approved via the EEO process." SAC Ex. B.

29.     MSJF ¶38 is disputed. McGuire had already stripped the CATS program of all staff an equipment after his unannounced visit. PEX 4, 281:13-282:4. As to the reasonable accommodation process, McGuire oddly included this matter in a personnel reassignment memorandum. DEX 18 at 2. The memorandum ignores that McGuire had already met with DEA officials in the Chief Counsel's Office to discuss "undue hardship" but had not asserted hardship,

11

and it ignores that Katz had already filed his formal complaint of discrimination on April 18, 2019, just five days earlier. SAC Ex. A.

30.     MSJF ¶39 is disputed as it combines a statement of Plaintiff's actions, which are agreed to, with the purpose of the DEA Health Unit, which is not a fact but a supposition by the Agency. It also includes that Plaintiff provided medical documents to Deborah Lary and includes an unsupported assertion that Lary had the documents reviewed by "DEA physicians." It should be noted that for insofar as MSJF ¶39 omits critical information about how and why the documents were requested and is objected to. Plaintiff did not initiate the request for a medical advisory but was told he had to involve the Health Unit as part of his reasonable accommodation request at that time. PEX 33.

31.     MSJF ¶¶40-41 are contested because the memo imposing the medical advisory was authored by Deborah Lary, not the unnamed physician. DEX 7. Furthermore, the Plaintiff made several trips to Sinaloa Mexico to conduct installations and testing of CATS while under a medical advisory. Plaintiff had also taken previous trips included an attempted arrest of Chapo Guzman where the DEA office was put on lockdown in 2015 due to legitimate threats against DEA personnel. Once again DEA knew these were locations where potential for physical confrontation existed and sent the Plaintiff there with medical advisory in place. PEX 33 at 1 and 2. Furthermore, no one ever followed up about his medical advisory status until 2019.

32.     MSJF ¶43 is disputed and omits material information. Plaintiff filed an informal complaint of discrimination on or about March 8, 2019, and a formal complaint of discrimination on or about April 17, 2019. In his communications with Orr and the Agency, Plaintiff requested to know whether his existing accommodation had been revoked and what if any undue hardship determination had been made as to that revocation. DEX 21, 22. PEX 14a. As of May 2, 2019

Plaintiff was still assigned to his former position, albeit with no duties. Orr requested that Katz commence the reasonable accommodation process, but, Katz refused to concede that he was not entitled to his existing accommodations. DEX 24 at 2-3. Despite these disputes, Plaintiff did provide updated medical information, namely a letter from Dr. Gertner letter, stating he can perform the requirements of an 1811 series *with existing accommodations*. *Id*. The agency did not respond to that letter. In fact, Orr never adequately responded to Plaintiff, or his counsel's requests. Under these circumstances, existing agency policy meant the agency should have simply ordered a medical examination and offered to pay for it. PEX 15, 27:2-12.

33.     MSJF ¶¶ 44-45 are simply untrue and reflect selective quotes. The actual statements are in DEX 23-24, and 25. Plaintiff did not refuse to respond to Orr, he questioned over and over again asking why the DEA was withdrawing his accommodations and why his previously paperwork was no longer considered sufficient. DEX 25. While protesting what he believed to be violations of the Rehabilitation Act of 1973, Plaintiff, who had already filed his formal complaint against the agency for its conduct, did provide supporting documentation form his physicians, at his own expense, which neither Orr nor the Agency responded to. SAC Ex. A, DEX 25 at 1. PEX 14b. PEX 14c. Indeed, Katz even offered to travel for a full medical examination which was refused. SAC Ex. J. The DEA never clearly stated how Katz's prior submissions were not sufficient, what additional information was needed or on what authority it was requested. DEX 25. PEX 14a, 14b and 14c. The DEA never advised Katz of who would review his medical information or for what purpose. DEX 25. PEX 14a, 14b and 14c. The Plaintiff had forwarded the requests from the agency to his doctor and was awaiting their reply. The Agency never sent him the required forms to pay for a medical examination as policy required and had refused his requests to complete one. SAC Ex. J.

34.     MSJF ¶46 is disputed and refers to documents that contain much more detail about the Plaintiff's position concerning the nature of the inquiry into his medical situation and the agency's motivation for doing so. DEX 24, 25. To the extent this characterization is incomplete and inaccurate, it is disputed, and the document is the best evidence of Plaintiff's statements. Critically, the email communications appear to completely ignore Katz' previously submitted medical documentation and ask him once more to disclose what his medical condition was, which had not changed. DEX 24 at 3. Furthermore, MSJF ¶46 omits the May 21, 2019, demand from the Plaintiff's representative that the agency specifically identify the basis for the withdrawal of the existing reasonable accommodations, and what undue hardship the reasonable accommodations had presented. DEX 24 at 2-3.

35.     MSJF ¶47, is supplemented to note that this May 28, 2019, letter was just a few weeks after the initial request and responded to confirm the validity of the Plaintiff's requested accommodations. The physician also stated, "If you have any questions, you may reach our office at [phone number]" DEX 26. No call was placed in response to the letter.

36.     MSJF ¶48 is not a fact but an opinion. Further, it appears to be disputed by the Agency itself. Neither Orr, nor Lary are medical doctors and may not evaluate the sufficiency of medical documentation. PEX 16, 14:8-22, 15:1-122 and 16:1-18. PEX 17, 23:2-16. Nor is Lary normally involved in the reasonable accommodation process. PEX 18 at 1. Lary was uncertain why she was even part of this process. Further, MSJF ¶48 facts are supplemented to note that DEX 25, 26, and 27 contain much more information about why the Plaintiff was seeking to find a position and why he believed that he could serve in the indicated role. Again, at this point, the agency should have offered to pay for a medical examination and failed to do so. PEX 15, 27:2-12.

14

37.     MSJF ¶50 is not a fact. Dr. Hampton's statements are hearsay and objected to on those grounds. To the extent they are not, the Agency conflates reasonable accommodation with fitness for duty and "medical clearance," a term that has no import for Katz and remains undefined. First, the Agency must medically clear its personnel not the treating private physician of the employee. Additionally, Dr. Chang was not asked to "medically clear" the Plaintiff, he was asked to opine regarding the ability of the Plaintiff to perform the essential functions of his role with a reasonable accommodation. Chang responded that Plaintiff still required accommodations. Something Dr. Hampton failed to address.[7] Medical advisories and reasonable accommodations are not interchangeable terms, and the processes for each are different. Those inquiries are separate and distinct from one another. PEX 15.

38.     MSJF ¶51, is contested and incomplete. Initially it should be noted that the DEA was conducting medical examination outside the requirements of the Rehabilitation Act and the regulations set forth at 5 CFR § 339.101 *et seq*. The Agency was required to send Katz for such an examination at its own expense, if it deemed, he was not fit for duty or questioned his current medical condition. DEX 23. PEX 15, 75:8-16. At this point in time, Katz's reasonable accommodations already existed and had yet to be officially cancelled, revoked or otherwise withdrawn, thus Katz questioned the excessive requests for medical information by an Agency, whom he had already filed claims against. DEX 23. Nevertheless, to avoid claims of non-compliance or failing to cooperate, on or about June 21, 2019, the Plaintiff requested permission to travel to see his treating physician, Dr. Chang, as the agency had asked for updated medical information, and the level of detail required was such that his doctor wanted to perform a new

---

[7] The Defendant made no mention of Dr. Hampton until well after this suit was filed. The Defendant in fact refused to advise Katz, that Dr. Hampton was reviewing his records, nor did it ever advise Katz of her review and opinion prior to him resigning from the Agency.

examination. SAC EX. J. Katz explained to Ms. Lary, "…the medical documentation you have requested he prepare regarding my fitness for duty [Katz's Physician] has advised that in order to complete this level of medical documentation I will need to travel to Stanford for a complete medical assessment. Please advise how you wish to proceed regarding this required travel and who I should contact to arrange the funding." DEX 32. SAC Ex. J. Lary, who is not a licensed physician, unilaterally denied the request, and stated, "Your treating physician should be able to complete this form as much as he is able. If he does not feel comfortable answering something he can simply state he is not able to assess. We need to know if you are still having the symptoms you complained about in the past. That is something he should be able to answer." DEX 32 at 2. Dr. Chang's office responded directly to the inquiry and stated that he was "unable to comment on current status" of the Plaintiff, and last notes were from an assessment dated "7/5/2017" and "last film review performed 9/19/2018." *Id* at 3. Katz' physician clearly asked to do a more recent exam, but that request was denied. SAC Ex. J. Thus, his physician pointedly noted that Katz's s last physical impression of the patient was quite some time ago, and he could not provide an update. Under DEA policy, records from this long before should not have been used to evaluate the plaintiff's current need for a medical advisory. PEX 15, 75:17-20.

39.     MSJF ¶53 is contested and supplemented to note that Dr. Hampton never examined Katz, and clearly was relying on records which only referred to a 2017 exam. DEX 32. The July 3, 2019 medical advisory cancellation (DEX 34) makes clear the finding was based on a mistake of fact and referred to Katz' medical advisory cancellation as being based on "new medical information." The records in fact were clearly more than a year old, and from a pre-treatment physical examination after the agency had refused to allow the Plaintiff an in-person examination. DEX 32, SAC Ex. J. Under policy, they should not have been used to cancel a medical advisory,

and an examination should have been paid for by the agency. DEX 3, PEX 15, 27:2-12. The medical advisory cancellation was sent to Gregory Cherundolo and Katz at 10:43 am, and forwarded to Michael DellaCorte at 10:46 am, who then forwarded it to Luke McGuire at 10:47 am on July 3, 2019. DEX 35.

40.     MSJF ¶54 is contested and objected to as double hearsay and opinion, and contains mistakes of fact. Lary, who is not a doctor, opines on the sufficiency of Katz's medical doctor's evaluation. Nowhere, does she cite Dr. Hampton but merely relies on some undisclosed personnel. This fact cannot be an undisputed fact because Lary is completely unqualified to make it, and admitted she did not review the records herself. PEX 19, 774:16-22, 775:1-7. Under Virginia law only a doctor can render an opinion on medical conditions. The "fact" that Lary purports to make here presented as undisputed it merely her surmise that Katz, who certainly did still have a brain tumor, was somehow capable for full duty based on "new information" which was actually old. DEX 36. Lary's own writing expresses confusion between the medical advisory process and that of reasonable accommodation. DEX 36 at 4-5. The agency places GS-1811 Special Agents on medical advisories, but a reasonable accommodation is a distinct employee initiated request. DEX 3. PEX 15, 66:3-7. Determining that an employee is functionally capable of performing his job duties does not obviate the need for accommodation and Lary's email only establishes that Katz's medical advisory should be listed. She did not state that Katz's existing reasonable accommodations should be revoked with no notice to him and not opportunity for further review or medical support. DEX 36. Lary's confusion may be understandable since she stated., "…I normally don't get involved in the reasonable accommodation process." DEX 36 at 5. For the reasons stated in response to MSJF ¶53, and the above, the conflation of the medical advisory process and the reasonable accommodation process are separate and distinct inquiries. PEX 15,

37:11-22.

41.    MSJF ¶55 is supplemented to note that Katz never applied for or requested the position Cherundulo placed him in. Cherundolo testified that he moved Katz because McGuire and DellaCorte repeatedly advised Cherundolo that Katz was a poor employee. PEX 20, 21:5-18.

42.    MSJF ¶56 is contested because the email actually stated that Orr was, "under the impression" that the Plaintiff "no longer in need of a reasonable accommodation" except for time to see his doctors for periodic medical appointments. DEX 38. Within a few hours, Katz representative responded and stated he "requires his existing accommodations be continued. Please confirm." DEX 38 at 3. Orr did not respond to or acknowledge that email. Furthermore, MSJF ¶ 56 is supplemented to note that on July 10, 2019, The Career Board ("CB") Executive Secretary, Lawyer Wilson, had emailed Mary Valdivia, copying McGuire indicating

> "The Office of Domestic Operations will be submitting a memo to OC tomorrow morning (Thursday), requesting a TCN for SC Kats, who is currently assigned to the Command Center & Crisis Preparedness Section (ODC), position at Ft. Bragg, Fayetteville NC. The TCN will be used to relocate Mr. Katz back from NC to the building where he will be reassigned within Operations Division. It is of utmost importance that his TCN issuance remain confidential due to its sensitivity. Section Chief McGuire will personally hand carry the memo to the CB for processing, pending funds." PEX 21.

43.    MSJF ¶57 is contested insofar as the email chain speaks for itself and supplemented to note that the Defendant never supplied a DOJ Form 100C reflecting the reason for the cancellation of the reasonable accommodations, a mandatory step for all decisionmakers. PEX 33 at 9. PEX 22.

44.    MSJF ¶58 is objected to as the email referenced speaks for itself, and for the reasons stated in response to MSJF ¶57, namely that the Plaintiff's representative already stated, "Mr. Katz requires that his existing accommodations be continued. Please confirm. PEX 23. DEX 38 at 5.

45.    MSJF ¶59 is contested, as it relates to the letter being sent by Dr. Getner, a Board

Certified physician and surgeon, who was present for Dr. Chang's physical examination of the Plaintiff in 2017. PEX 33, DEX 4 at 102. The other comments reflect the relationship Katz had with his treating physician and are immaterial, unrelated and irrelevant as to any matter at issue.

46.     MSJF ¶60 is contested, as the Defendant seems to conflate a physical exam with a medical examination. Dr. Gertner reviewed the Plaintiff's scans, attended his in-person examinations with Dr. Chang and consulted with Dr. Chang. DEX 4 at 102. That is far more than any DEA Health Unit employee ever did.

47.     MSJF ¶61 is objected to as inaccurate, as Dr. Gertner offered to discuss the matter directly with a medical professional. The DEA ignored this request. Dr. Gertner's subsequent August 25, 2019, letter is over two pages, single spaced, and clearly responded to the agency's inquiry in detail. He concluded with a request for physician-to-physician communication to clarify any remaining doubt. The DEA failed to respond to Dr. Gertner, even after his August 25, 2019, letter. DEX 41.

48.     MSJF ¶62-64 are incomplete references to the identified communication but do otherwise exemplify the needlessly repetitive and detailed requests the Plaintiff faced. At no point did the agency advise the Plaintiff to explain his previous medical documentation was ignored.

49.     MSJF ¶65-66 merely states Orr's non-medical opinion. It is not a fact that Dr. Gertner failed to provide the necessary information. It is Orr's opinion he did not and Orr is neither a doctor nor a licensed medical professional of any sort. Orr had no training in functional assessments, internal medicine, vocational expertise, or analysis of functional limitations, neurology, neurosurgery, radiosurgery or radiation oncology or neurological impairments that can result from brain tumors. PEX 16, 14:8-22, 15:1-22 and 16:1-18. As to ¶66, what DEA "wanted to know" is not a fact, it is a speculative opinion and a misstatement. Orr may have wanted to know

19

something but there is no evidence that the "DEA" took that position or even sanctioned the inquiry.

**Plaintiff's New Position at DEA HQ**

50.     MSJF ¶67 is contested Plaintiff asked about his accommodations because he was unaware they had been withdrawn.

51.     MSJF ¶68 is contested in part because the date of the withdrawal of the accommodations is unclear, as is the identity of the person responsible for cancellation.

52.     MSJF ¶69 is simply false and not factual. Plaintiff's doctor had specifically requested *physician-to-physician* communication in his August 25, 2019 letter, to avoid what Dr. Gertner deemed to be excessive demands for information by persons not qualified to review them. MSJF ¶69 also ignores that despite the protest, Plaintiff granted the DEA the right to speak to his physician. The DEA failed to follow up, not Katz. PEX 14a, 14b and 14c.

53.     MSJF ¶72 is contested as Plaintiff retired from the agency on the date indicated.

## V.     ARGUMENT

**I.     Due to disputed, material facts, the Defendant is precluded from judgment as a matter of law on the Plaintiff's failure to accommodate claim (Count 1).**

The Defendant's argument that he is entitled to judgment as a matter of law is unsupported by facts and applicable law. The Plaintiff easily makes a prima facie case that (1) he was a qualified individual with a disability within the meaning of the statute, (2) the employer had notice of his disability, (3) that with reasonable accommodation he could perform the essential functions of the position and (4) that the employer refused to make such accommodations. After all, he had requested and been granted two separate reasonable accommodations by the employer. There can be no credible argument that Katz was not eligible to receive the reasonable accommodations in

question as the agency itself granted them, and he worked with them in place for more than 20 months. The Defendant misapprehends the relevant legal standard. Once a reasonable accommodation is granted, an employer must demonstrate undue hardship to revoke it. At the summary judgment stage, a plaintiff "need only show that 'an accommodation' seems reasonable on its face,' and then the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship.' " *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015). The Defendant has made no such showing here.

### A. Plaintiff responded to the Defendant's particular questions promptly despite poor adherence to policy and repetitive requests and continued to engage in the interactive process.

The undisputed facts are that the Plaintiff had two reasonable accommodations granted to him in fall of 2017, neither of which were noted as temporary. DEX 8, DEX 10. One reasonable accommodation was the reassignment to the CATS Staff Coordinator position, and the permission to telework as needed was the other. *Id.* After McGuire became the Plaintiff's supervisor in November 2018, McGuire purported to undertake an objective assessment of the CATS Program. PEX 29 at 43. But McGuire pursued this assessment while excluding the Plaintiff from the process. Rather than go straight to the source for information about the program or engage with the Plaintiff directly, McGuire refused to answer basic questions about what his intentions were for the CATS program. When Katz asked McGuire directly about McGuire's intentions for the program on February 27, 2019, McGuire gave no direct reply, but advised him to seek counseling.[8] SAC Ex. B. Rather than ask for his reasonable accommodation paperwork at that point, McGuire instead emailed HR and asked HR Specialist Janelle Davis, "When you have time, please check to see if

---

[8] Katz stated in an email to McGuire, "Based on my current medical situation and inability to relocate, I would like to know what are your intentions related to my situation, this uncertainty is causing a great deal of unnecessary stress." Arguably, Katz was attempting to find out whether or not his reassignment was under consideration. This was a reasonable inquiry.

his accommodation was routed through and officially approved via the EEO process." *Id*. Due to DEA's EEO process being poorly managed, Ms. Davis did not know of Mr. Katz' reasonable accommodations, which led McGuire to later accuse Katz of being impermissibly absent from work.

Each time the Plaintiff was asked to respond with more information, he arranged for a response. He ultimately provided over 6 different letters from his physicians indicating that he needed a reasonable accommodation but would be able to work successfully with one in place. DEX 26, 38, 40 and 41. SAC Ex. I, K at 6, and M. PEX 27 – Filed under Seal. In June 2019, the Plaintiff offered to travel for a medical examination to resolve whatever confusion remained about his condition, but the agency refused to pay for it as the law and their own policies required. PEX 24, 128:10-17. As for the claim that he did not need to see a particular provider, or go often enough, in a November 4, 2019 visit, Dr. Calhoun Cunningham noted that ███████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████ Such symptoms could be a sign that surgery in a post-radiated field was necessary, an area where Dr. Cunningham was uniquely qualified to assist. DEX 12. ECF No. 95-1 at 70. The reason to avoid direct surgical intervention is because, depending on the approach taken, ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

## B. Plaintiff's desire for continued accommodation was reasonable, and Defendant failed to show undue hardship.

The DEA's EEO interactive process is confusing, poorly managed, and inconsistent. The Defendant argues it made several attempts to secure updated medical records that would verify the

Plaintiff's need to remain "permanently" close to Duke for specialty medical care. ECF No. 95 at 21. But the Plaintiff was not seeking anything more than a continuation of reasonable accommodations he had already been granted. Nor did the Defendant explain why the existing documentation was suddenly insufficient support for continuation of his accommodations. Finally, and critically, the Defendant did not identify any actual undue hardship presented by continued reasonable accommodation. In fact, contradictory sworn testimony from their own witnesses undermines any case that the reasonable accommodations presented the Defendant with any undue hardship.

Though there is reference in email to "undue hardship," no witnesses agreed what the hardship was. Specifically, McGuire denied ever deciding whether or not Katz' continued reasonable accommodations ever presented an undue hardship.[9] Though a March 28, 2019, email indicated Derek Orr had "agreed that the reasonable accommodation is now an undue hardship based on the CATS Program" Orr testified, "Well, I wouldn't determine whether or not it's undue hardship or not. That's not my job. That's not my area. So that would come from McGuire who would say that it was undue hardship. So, I may agree with him based on his explanation, but it wouldn't be my job to, you know, determine undue hardship." PEX 31, 42:20 – 43:5. Viewed in the light most favorable to Katz, this testimony shows clearly disputed facts about who, if anyone, determined there was any undue hardship. It appears that none of the people alleged to have made that determination actually did. The Plaintiff does not argue his reasonable accommodation once granted is set in stone. He merely seeks to hold the Defendant to the heavy burden of showing a legitimate reason for refusing to continue his reasonable accommodation when there exists no

---

[9] When specifically asked about who performed the hardship analysis, McGuire stated, "That would not have been handled by me, that's not my responsibility." He was asked to confirm he did not make such a determination, to which he testified, "That is correct." PEX 4, 1:18 – 12:5.

evidence of undue hardship.

There were many things the Defendant could have done differently to show its good faith participation in the interactive process, and a sincere desire to accommodate the Plaintiff. The agency could have kept track of the paperwork used as the foundation for the initial accommodations. Instead, it was lost, sowing confusion. On finding out that there was a non-enforcement role in Atlanta from Greg Cherundolo, agency management could have advised Katz of the role and avoided having to address the medical advisory/nonenforcement issue all together. PEX 25, 27:8-15. Instead, Michael Dellacorte never passed the information down to McGuire or Katz, preventing a potential solution from ever being explored. PEX 33. The agency could have explored transferring Katz to the San Francisco Field Office, to be within close proximity to his treating physician at Stanford. The agency could have complied with its own policies in paying for a medical examination to actually evaluate the Plaintiff's functional limitations with regard to the GS-1811 physical standards or contacted Dr. Gertner directly as he offered to engage with them about the matter. DEX 41. Had there been a determination that the Plaintiff permanently failed to meet physical standards, the agency could have provided for disability retirement, or reclassified Katz as a GS-1810 series investigator either within the agency or outside of it. It opted for none of these.

## II.    The Defendant's stated legitimate business reasons for acting against the Plaintiff are pre-textual excuses for retaliation and Plaintiff can show causation.

To establish a prima facie case of retaliation under the Rehabilitation Act, the plaintiff must show: (1) that he engaged in a protected activity; (2) that the employer acted in an adverse manner; and (3) that the protected activity was causally connected to the adverse action. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq. *Vanyan v. Hagel*, 9 F. Supp. 3d 629 (E.D. Va. 2014). *See Holland v. Wash. Homes, Inc*., 487 F.3d 208, 218 (4th Cir.2007). The Supreme Court has held

that "a plaintiff's prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, support[s] an inference of discrimination sufficient to defeat summary judgment." *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012))., 466 F. App'x 272, 277 (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). *Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021). Courts, including this circuit, have repeatedly held that an 11th hour explanation for employer conduct will not suffice to defeat a pretext claim. *EEOC v. Sears Roebuck and Co.*, 243 F.3d 846, 856 (4th Cir.2001). Where a plaintiff can show inconsistency between the employer's proffered non-retaliatory reasons which change or shift over time, are false, or based on mistakes of fact, summary judgment is not appropriate. *Smith* at 421.

To demonstrate a prima facie case for causation in the retaliation context, a Plaintiff may choose one of two paths. *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021). First, a plaintiff may establish that the adverse act bears sufficient temporal proximity to the protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Second, a plaintiff may establish the existence of other facts that alone, or in addition to temporal proximity, suggests that the adverse employment action occurred because of the protected activity. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that "other relevant evidence may be used to establish causation" where temporal proximity is missing or weak).

As a threshold matter, it is unclear who actually decided to relocate the CATS Program and when. McGuire stated in his March 21, 2019, email to Katz that "I have determined that it is in the best interest and needs of the CATS Program and the DEA as a whole to have your position reassigned to the local Headquarters area." DEX 16. Later, McGuire testified that, "I made a

recommendation based on my assessment to my first line supervisor [Dellacorte] who concurred with my recommendation." DEX 11 at 16, ECF No. 90 at 18. He is noticeably vague at to when that determination was made. This material factual information is in dispute.

The Plaintiff first contacted the DEA's EEO Officer Goode on March 6, 2019, and first contacted the EEO complaints office on March 8, 2019. PEX 34. On March 14, 2019, McGuire conducted an unannounced site visit to Ft. Bragg, and on March 15, 2019, the Plaintiff notified McGuire that he had filed an EEO complaint. PEX 9. On March 18, 2019, the Plaintiff sent over his reasonable accommodation paperwork as instructed. PEX 35. Just two days later, McGuire notified the Plaintiff of his intention to reassign the program to the Northern Virginia area on March 21, 2019. DEX 16. McGuire testified that his reason for the surprise visit before making a decision about moving the program was that, "I wanted to see the site for myself before I finalized my recommendation." PEX 4, 179:1-5. Thus, it is not clear as a matter of law that the decision to move the program pre-dated the Plaintiff's protected activity. Viewed in the light most favorable to Katz, given the very short time period between his protected activity and the revocation of his job duties, temporal proximity is present. Similarly, the reason for not informing Katz of the visit, ostensibly to gather better information, is deeply cynical and unfair if the assessment had already been completed. Finally, McGuire lowered the Plaintiff's performance rating in the immediate rating period following the reassignment of the CATS Program and forbid all incoming employees from even speaking with Katz about the program. PEX 33. This is all evidence of a retaliatory motivation in management's treatment of the Plaintiff. PEX 26, 58:4-21. Finally, it is not dispositive that Cherundolo was the official decisionmaker on Katz' July 11, 2019, transfer. First, there was the sensitive nature of the transfer control number as communicated in an email the day before the transfer was officially approved. PEX 21. Second, Cherundolo testified that McGuire

and DellaCorte had repeatedly complained about Katz to him (something they each denied). Further Cherundolo, who admitted no personal knowledge and relied on reports from McGuire and DellaCorte, repeated as true certain factual mistakes that DellaCorte or McGuire had told to him about the CATS Program site visit. PEX 33. Due to McGuire's description of the site visit, Cherundolo mistakenly believed that DEA equipment was improperly stored, "maintenance shed in an unsecured building." PEX 36, 21:15-18. This was incorrect. PEX 33. Thus to the extent Cherundolo was not directly motivated by discriminatory animus, he was influenced by those that were (McGuire, DellaCorte) on a cat's paw theory of liability. In order to proceed on a theory of "cat's paw" liability, the true deciding official need not have been the official responsible for taking a personnel action, but rather, could have influenced the official decisionmaker. *Staub v. Proctor Hospital,* 562 U.S. 411 (2011).

**III.     Plaintiff has sufficient evidence of constructive retaliatory discharge.**

For a plaintiff to establish constructive discharge, he must be able to show that his former employer "deliberately made an employee's working conditions intolerable, and thereby forced him to quit." *James v. Booz–Allen & Hamilton, Inc*., 368 F.3d 371, 378 (4th Cir.) (citation omitted), cert. denied, 543 U.S. 959, 125 S.Ct. 423, 160 L.Ed.2d 323 (2004). *See also Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 716 (D. Md. 2013).

The undisputed facts are that for the period of March 15, 2019 until July 20, 2019, the Plaintiff's supervisor had created working conditions where all the contractor workers he supervised had either been terminated or resigned. McGuire Dep. at 281. McGuire had Bordonaro terminated when he defended Katz' running of the program despite his diagnosis, and Guerra specifically identified an atmosphere of retaliation in her resignation email. PEX 8, PEX 5, PEX 3, PEX 37 at 198, PEX 3. Ms. Guerra's resignation letter further supports the conclusion that DEA

management was targeting Katz. On March 15, 2019, she stated

> Information is intentionally withheld related to major changes of the program. The entire team is intentionally left out of meetings, in what I can only describe as unprofessional behavior as a result of DEA internal politics. There are personal vendettas against the agent assigned to the program that has created backlash for the team. Unfortunately, this level of scrutiny, harassment and hostility has intensified. On Friday March 15th, after arriving at the Ft. Bragg work space, I discovered that Luke McGuire and Mina Hunter had made a surprise visit and removed all the work computers from the CATS office, this makes utilizing the space impossible. I cannot effectively perform my duties under these conditions. I have been provided no guidance as to how I am to proceed and have been ordered to not make contact with anyone outside of DEA without government representation. Working on this contract under these conditions has become untenable. Due to these working conditions, I can no longer provide support for Compass Strategy Solutions or the DEA, hence my resignation letter effective on the date stated above. PEX 8.

These facts are direct proof of retaliation against Katz.

Beginning in March 2019, but certainly worsening after the site visit, Plaintiff was effectively without job duties of any kind. PEX 4, 28:10-16. McGuire admitted as much and testified "I couldn't find any work for him." DEX 11 at 27, 28. McGuire's efforts to find him a new role were anemic and began far too late. It took the agency over a month to even notify Katz of its intention to re-initiate the interactive process in April 23, 2019 via memo. DEX 18. This occurred during a time when agency policy required much more robust search for positions within DOJ or the federal government as a whole. Furthermore, despite Cherundolo being aware of a non-enforcement position in the Atlanta Office, Michael DellaCorte never shared the information with McGuire. PEX 4. 318:11-20. Thus, while working as a 22-year veteran GS-14, 1811 Supervisory Special Agent for the Defendant, the Plaintiff idled for many months, and during that time, understandably developed no desire to continue working for his employer due to the abysmal nature of his working conditions. This situation was created by management and continued for months prior to the Plaintiff being forced into retirement on March 31, 2020.

Given the serious departure from policy he experienced, the evidence shows Katz lacked

assignments for months, and on his report date of March 31, 2020, had he gone to the office he would have found the doors locked, a fact the DEA neglected to tell him. Additionally, the selective application of an employment policy, may establish proof a corporate culture of discrimination that cuts against summary judgment. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir.2010). In addition, viewed in the light most favorable to Katz, the evidence supports the conclusion that Katz reasonably believed that he was risking his health by continuing to work for the Defendant, and sought counseling for the emotional distress he was experiencing at work. He also took sick leave for months to avoid having to face the impending return to Headquarters, an involuntary transfer which was extremely "rare "for someone at his GS-level to experience. PEX 26 58:4. Collectively, under these conditions, the Plaintiff has sufficient evidence that a reasonable fact finder could determine he was constructively discharged in retaliation for asserting his protected rights. Accordingly, the Plaintiff should be allowed to proceed to trial on Count IV.

Contrary to the Defendant's motion, there remains a disputed factual issue whether or not Katz' involuntary transfer meant his health was jeopardized. As has been indicated by the medical documentation, the agency did not determine he could be accommodated in Northern Virginia, nor evaluate whether specialized similar medical care was available to him there. Instead, it conflated the medical advisory process and reasonable accommodation process, and concluded he needed no accommodations whatsoever. This effectively advanced the incorrect position, over Plaintiff's objection, (DEX 4, at 144, 177) that his condition had resolved. It had not. Given this, Katz was faced with a Hobson's choice, return to the DEA Headquarters' position and lose access to Duke, or resign. The agency fails to address this point by arguing whether or not his job duties, which were nonexistent, were unpleasant enough can be decided as a matter of law. This ignores the

fundamental issue which is that by concluding he needed no accommodation at all, and refusing to engage directly with Katz' physicians, the agency dodged the issue of actually evaluating whether the type of treatment at Duke could be obtained in Northern Virginia. The denial of the accommodation itself, and the refusal to continue communication about it, triggered Katz' decision to retire as expressed in Katz' affidavit. A reasonable person might conclude, based on the facts viewed in the light most to Katz that his working conditions had become objectively intolerable. Had DEA transferred Katz to the San Francisco area, with access to Stanford, or performed an assessment that the DEA Headquarters area had appropriate facilities the situation may have been different. This analysis never occurred.

## VI.   CONCLUSION

The Plaintiff's claims for failure to accommodate, retaliation, and constructive retaliatory discharge are supported by sufficient evidence to survive summary judgment. In addition, there are genuine disputes over material facts regarding the Plaintiff's claims and Defendant's defenses, which should be resolved at a trial. The Defendant's Motion should therefore be denied.

Dated: December 7, 2022                    Respectfully Submitted,

*/s/ Grace Williams*
Kevin E. Byrnes, VSB No. 47623
Grace Williams, VSB No. 88103
Kelly E. DuBois, VSB No. 92014
**FH+H |** 1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T: (703) 590-1234 | F: (703) 590-0366
kbyrnes@fhhfirm.com
gwilliams@fhhfirm.com
kdubois@fhhfirm.com

*Counsel for Plaintiff*

30

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on December 7, 2022, I electronically filed the foregoing Memorandum in Opposition to the Defendant's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Grace Williams*
Grace Williams, Esq.
